**UNITED STATES of America,**
**Appellee,**

**v.**

**Coye BOATNER, Appellant.**

**No. 600, Docket 72-2287.**

United States Court of Appeals,
Second Circuit.

Argued Feb. 15, 1973.

Decided May 4, 1973.

738

Henry J. Boitel, New York City, for appellant.

Frank H. Wohl, Asst. U. S. Atty. (Whitney North Seymour, Jr., U. S.

Atty., S. D. N. Y., and John W. Nields, Jr., Asst. U. S. Atty., of counsel), for appellee.

Before FRIENDLY, Chief Judge, OAKES, Circuit Judge, and DAVIS, Judge.*

OAKES, Circuit Judge:

■ Following a six day trial before a jury and Judge Cooper in the Southern District of New York, appellant, Coye Boatner, was convicted of one count of possession of counterfeit money in violation of 18 U.S.C. § 472 and sentenced to three years' imprisonment. His principal claim on this appeal, one which is heard frequently, see, e. g., United States v. Nazzaro, 472 F.2d 302 (2d Cir. 1973); United States v. Pellegrino, 470 F.2d 1205 (2d Cir. 1972), cert. denied, 411 U.S. 918, 93 S.Ct. 1556, 36 L.Ed.2d 310 (1973); United States v. Dellinger, 472 F.2d 340, 385–391 (7th Cir. 1972), cert. denied, 410 U.S. 970, 93 S.Ct. 1443, 35 L.Ed.2d 706 (1973), is that the trial judge's "disparagement" and "intimidation" of defense counsel denied appellant a fair trial.

A brief recital of the evidence introduced at trial will help put appellant's contention in perspective. The Government's proof established that in June, 1971, appellant received $700 in counterfeit bills in the Bronx from a convicted counterfeiter, one Goodson, who was the principal witness against appellant at trial. It also established that at a hamburger stand in New Orleans appellant had passed a phony $10 bill made from Goodson's plates and negatives. The defense's contention was that the Bronx transfer never occurred and that appellant had inadvertently passed the phony $10 bill in New Orleans after receiving it from his girl friend, who in turn had received it from Goodson. The defense claimed that Goodson lied because he sought revenge against appellant for his previous testimony before a grand jury which led to Goodson's indictment and ultimate prison term on a counterfeiting

* Of the United States Court of Claims, sitting by designation.

charge. The jury, however, apparently rejected appellant's version of events and credited the Government's case.

The trial began amicably enough, with the judge telling the jury that "[b]oth lawyers on both sides have the respect of the Judge, they are fine, upright accredible [sic] members of the Bar, and we are proud of them, they are fighting, as they should, for their respective sides . . . . " Soon, however, interaction between the trial court and defense counsel, a former Assistant United States Attorney, developed unmistakable overtones of hostility and acrimony. The flames of hostility that were later to blaze were apparently initially sparked by defense counsel's delay in making certain suppression motions until the day of jury impaneling. They were fueled by defense counsel's omission, despite his knowing that the trial was set to begin at 10:00 a. m., to inform the court he had another court appearance that would prevent his being in court at that time. Defense counsel did not appear in the courtroom until 10:20 a. m. on the day that the trial was to begin, and trial did not begin until 10:55 a. m. Hostility between court and counsel first burned openly in an exchange begun by what the trial court believed were defense counsel's unwarranted interruptions of Goodson's testimony on cross-examination after counsel had asked Goodson to "[t]ell me everything" about a particular happening. The trial court reacted strongly to defense counsel's argument with the court's sustaining of the prosecution's objection on the point. Before the jury, after the Government's objection, the court said, "You are right. Please continue." Defense counsel replied, "I disagree. I don't think he is right." This exchange ensued:

> The Court: Stop it.
>
> Mr. Gold: I am not—
>
> The Court: I will not take any impudence.
>
> Mr. Gold: I am not being impudent.
>
> The Court: Don't do that.

> Mr. Gold: I am not doing anything, if it please your honor.
>
> The Court: Excuse the jury.

In the absence of the jury the court then expressed displeasure with the whole course of defense counsel's behavior up to that point in strong terms and at some length. He then asked defense counsel and the Government for comments, which too were at some length. When defense counsel moved for a mistrial, the following interchange occurred:

> Mr. Gold: Perhaps your honor would want to relieve me and declare a mistrial and get another.
>
> The Court: You just sit right down. That is what you would like.
>
> Mr. Gold: That is not what I would like.
>
> The Court: Don't holler at me, sit down.
>
> Mr. Gold: Your Honor—
>
> The Court: Don't.
>
> Mr. Gold: I will not be ordered about like some child in a courtroom.
>
> The Court: You are a child. I am directing you to sit down or I will hold you in contempt.
>
> Mr. Gold: I am not a child. Your Honor, I hope—
>
> The Court: Nothing further, quiet.
>
> Mr. Gold: I am entitled to courtesy.
>
> The Court: Bring the jury in.
>
> Mr. Gold: I want to be treated with courtesy.
>
> The Court: When you deserve it you will be. Sit down.
>
> Mr. Gold: Please, your Honor, don't address me in that tone.
>
> The Court: Sit down.
>
> Mr. Gold: I am telling you now, your Honor—
>
> The Court: I am telling you I will hold you in contempt of court if this continues.
>
> Mr. Gold: I am only trying to do what I think is best.
>
> The Court: I find you in contempt.

Mr. Gold: Yes, sir.

The Court: Bring the jury in.

Hostility and acrimony in the interactions between defense counsel and the trial court only increased in intensity thereafter. At a side bar conference at another point in the trial, the court called defense counsel's conduct "disgusting and shyster-like" and "denounce[d]" counsel for "creat[ing] a reason for a mistrial." Toward the end of the trial defense counsel's objection to a reference by the trial court to counsel's motive triggered the court in the presence of the jury to call a Marshal to help enforce the court's orders to defense counsel to sit down. Other examples of hostility and antagonism between court and counsel could be detailed at some length but to no particular point. Suffice it here to say that a number of incidents occurred throughout the trial.

■ Appellant blames the trial court and the Government blames appellant's counsel below for these events. We, however, see little utility in trying to assess proportionate blame on this "cold record." United States v. Grunberger, 431 F.2d 1062, 1067 (2d Cir. 1970). It may well be that much of the trial court's treatment of defense counsel was induced by counsel's lack of ordinary courtesy and close to contemptuous conduct; it is also true that "trial judges [must] display patience with counsel so as not to prejudice a party or create an impression of partisanship before the jury." United States v. Pellegrino, supra, 470 F.2d at 1207. Instead of seeking to apportion blame we prefer to consider the course of events as regrettable for all concerned and look rather to other "tile[s] in the mosaic of the trial," United States v. Nazzaro, supra, 472 F.2d at 304, to determine if a new trial is necessary. We conclude that it is not.

First, appellant has not substantiated his claim of prejudice flowing from the hostility between trial judge and defense counsel. In contrast to United States v. Nazzaro, supra, and United States v. Dellinger, supra, the trial court's comments did not create an impression that he personally believed in the appellant's guilt. United States v. Pellegrino, supra, 470 F.2d at 1207; United States v. Brandt, 196 F.2d 653, 656 (2d Cir. 1952). The trial court's comments were directed exclusively at the conduct of appellant's counsel, not—with one exception to be referred to below—at appellant's credibility or the strength of his case. United States v. Ross, 321 F.2d 61, 66 n. 3 (2d Cir.), cert. denied, 375 U.S. 894, 84 S.Ct. 170, 11 L.Ed.2d 123 (1963). While the trial court's annoyance was directed primarily at defense counsel, the prosecutor too received a share.[1] More importantly, the trial court's rulings on objections during the trial were quite evenhanded and displayed no bias toward one side or the other.

There may be a point, however, where hostility between court and defense counsel alone creates the kind of embattled and prejudicial atmosphere in the courtroom that makes a fair trial impossible. This case falls just short of it, however. Defense counsel in no way could be said to have been "intimidated" by the trial court. Rather his advocacy of his client's interests was vigorous throughout and only increased in vigor in proportion to the hostility from the trial court.[2]

1. For example, the Assistant United States Attorney was rebuked several times in front of the jury—indeed, referred to once as a "neophyte"—for supposed disrespect shown the trial court; for asking leading, repetitive or otherwise improper questions on cross-examination; and for conveying the impression on cross-examination that appellant had lied at a previous trial where he was acquitted on a counterfeiting charge.

2. A not atypical exchange occurred when at one point in the trial the court interposed an objection on behalf of appellant when defense counsel failed to object to a question similar to those to which he had previously objected. It is not sur-

The key question is whether the jury was prejudiced against appellant by the interchanges between the trial court and defense counsel. Most, fortunately, took place outside the presence or hearing of the jury. While it would have been much better had none of the hostility evidenced itself in the jury's presence, we cannot say that the few brief incidents in which it did inherently prejudiced the jury against appellant. The one of these that comes closest to the line occurred in the course of the cross-examination of the defendant himself the reporting of whi¢h (with colloquies) consumed over 160 pages of trial transcript. The cross-examiner was inquiring of the defendant as to his interrogation by two United States attorneys after the New Orleans bill passing incident. After several objections to the line of questioning and to specific questions, primarily on the basis that the interview was not used in the Government's case in chief and that it was unfair to confront the witness accordingly, defense counsel reiterated his objections as follows:

Mr. Gold: I have one more thing to bring up, to your Honor's attention, and that is that the Government did not make an offer of this conversation in its case in chief and they are deprived of the necessity of making an inquiry as to that interview. That is totally an unfair way and I ask for a voir dire out of the presence of the jury to determine whether that interview was consistent with my client's constitutional rights at that time.

prising that counsel responded, "I think I should be the judge as to when I object and when I don't." Counsel here quite surpassed Sir Edward Marshall Hall's comments to the court in connection with the Styles plea:

The Court: How many more speeches am I to hear? I heard you on Thursday.

Hall: I don't think Your Lordship did hear me; Your Lordship did not *wish* to hear me.

The Court: You have no right to say such a thing, Mr. Hall; it is a most indecent observation for you to make. I cannot allow it. You meant to be offensive, and you must not be offensive.

The court, somewhat exasperated by the repetitious nature of the objections, replied as follows:

The Court: Objection overruled. On every ground that you have put and I am going to ask you to please not to voice any more objections to this question and giving this witness a great deal of opportunity to contemplate and figure. That is not allowed. You are not supposed to do it. I asked a question and that called for an immediate answer, not time to contemplate by adding these continuous objections.

What you have done is interfere with the purpose of the examination. Now, you have your objection and the objection is overruled and now I will put the question again to you.

We think this was unnecessary and warranted entirely different treatment since it inferred in so many words that the witness needed time to contemplate his answers and thereby implied that he was not telling the truth. The trial judge was careful, however, to use strong curative instructions to attempt to erase any ensuing prejudice to the defendant. During the course of the trial and again in the charge the court reminded the jury that they were to deal only with the evidence before them, that "[t]he lawyers were not on trial here, this defendant is the one on trial," and that exchanges between court and counsel were to be "disregard[ed] completely" in their deliberations. These strong admonitions tend to mitigate any prejudice that ap-

E. Marjoribanks, For the Defense, The Life of Sir Edward Marshall Hall 182 (1954). Or in the Camden Town murder case, when Hall objected to the evidence of a barmaid at the "Eagle" as to the last meeting between the defendant and the victim; she failed to identify either the defendant or his companion, one Lambert.

Hall: I implore Your Lordship to note that this witness has not identified these men.

The Court: You have said that before; I have not forgotten it.

Hall: I thought Your Lordship did not *appreciate* it.

*Id.* at 231.

pellant might otherwise have suffered. United States v. Cruz, 455 F.2d 184, 185 (2d Cir.), cert. denied, 406 U.S. 918, 92 S.Ct. 1769, 32 L.Ed.2d 117 (1972); *cf.* United States v. Nazzaro, *supra,* 472 F.2d at 312–313 & n. 11; United States v. Frascone, 299 F.2d 824, 829 (2d Cir.), cert. denied, 370 U.S. 910, 82 S.Ct. 1257, 8 L.Ed.2d 404 (1962).

Finally, our conclusion that the prejudice to appellant was minimal is also reinforced by the strength of the case against him. United States v. Pellegrino, *supra,* 470 F.2d at 1208; United States v. Ross, *supra,* 321 F.2d at 66 n. 3. Goodson's testimony that he delivered the counterfeit money to appellant was corroborated by the testimony of his nephew, one Dogostiano. While the defense was able to challenge Goodson's credibility, it offered no motive to explain away Dogostiano's corroboration. Further, appellant admitted passing a counterfeit bill in New Orleans. His explanation for this, if not inherently incredible, was certainly implausible. The implausibility of the explanation is reinforced by appellant's denial of passing the counterfeit bill when first apprehended in New Orleans and denial when interviewed by the two Assistant United States Attorneys in New York even of being in New Orleans at the time in question. This was thus not a close case in which the verdict was tipped by the court's reactions to counsel.

■ Appellant's other contentions are less troublesome. Appellant claims that the Government violated the Second Circuit Rules Regarding Prompt Disposition of Criminal Cases (the "Rules") because five days before trial was to begin the Government requested a postponement on the ground that one of its key witnesses, a Louisiana resident, was pregnant and was advised by her doctor not to travel. The requested postponement was granted, and, as a result, trial was held ten months after indictment, not the six months appellant claims was required by the Rules.[3] The Rules, however, specifically provided that a continuance may be granted at the prosecutor's request when material evidence is unavailable. *See* Rule 5(c)(i); United States v. Counts, 471 F.2d 422, 427 (2d Cir. 1973). The Government was otherwise at all times ready to proceed within the letter and spirit of Rules 3 and 4. In short, appellant's speedy trial claim is frivolous.

■ Appellant's final claim is that the trial court improperly allowed appellant to be cross-examined and rebuttal evidence to be submitted concerning crimes not charged in the indictment. One part of this claim is based on evidence submitted about some stolen credit card receipts found during a search of appellant's car in New Orleans. After some evidence about these receipts was inadvertently introduced as a result of defense counsel's mistake about the nature of a list in a Secret Service report, the trial court ruled that it would not permit the Government to introduce further evidence about them in its direct case. *See generally* C. McCormick, Evidence § 190 at 447 (Cleary ed. 1972). The trial court, however, reserved ruling on whether cross-examination of appellant about the credit card receipts would be proper. Subsequently, the trial court allowed some cross-examination on the point. It may have been within the trial court's discretion to allow full presentation of evidence on the issue during appellant's cross-examination, as the defense's contention was that appellant inadvertently passed a counterfeit bill in New Orleans and use of the stolen credit cards could be said to be a similar criminal act showing appellant in fact had guilty knowledge. *See* United States v. Kaufman, 453 F.2d 306, 310–312 (2d Cir. 1971); C. McCormick, *supra,* § 190 at 450, 452. United States v. Semensohn, 421 F.2d 1206, 1208 (2d Cir. 1970), heavily relied

---

3. The Rules have now been superseded in this circuit by individual district plans for achieving prompt disposition of criminal cases promulgated under Fed.R.Crim. P. 50(b), which have received Judicial Council approval and had an effective date of April 1, 1973.

on by appellant, is inapposite, for the criminal act on which cross-examination took place there was totally dissimilar to the crime with which Semensohn was charged, United States v. Kaufman, *supra,* 453 F.2d at 311, and at best was only relevant to the issue of the defendant's general credibility. United States v. Glasser, 443 F.2d 994, 1002–1003 (2d Cir.), cert. denied, 404 U.S. 854, 92 S.Ct. 96, 30 L.Ed.2d 95 (1971).

But we need not and do not decide if full presentation of evidence about the credit card receipts on cross-examination of appellant would have been an abuse of the trial court's discretion. For the Government confined itself to establishing that appellant had some credit cards and that his denial of using them in New Orleans may have been false. Appellant's statement that others may have used the credit cards when they borrowed his car, for example, went unchallenged. This limited cross-examination was relevant to appellant's means of financing his trip to New Orleans, where one bill was passed, and thus was within the trial court's discretion. *See* C. McCormick, *supra,* § 190 at 448.

Also, it cannot be said that the trial court abused its broad discretion in allowing the prosecution to present rebuttal evidence that, contrary to appellant's statements on cross-examination, credit card receipts were found in an article of appellant's personal clothing, uncovered in the course of the search of appellant's car. United States v. Vivero, 413 F.2d 971, 972 (2d Cir. 1969), cert. denied, 396 U.S. 1017, 90 S.Ct. 583, 24 L.Ed.2d 509 (1970).

Appellant also claims that evidence relative to crimes not charged was erroneously admitted concerning a prior counterfeiting charge of which appellant had been acquitted. On direct examination appellant testified that he had told the grand jury and the petit jury at a prior trial that he had received some counterfeit bills from Goodson in payment for Goodson's rental of a room in appellant's house. He also testified on direct examination in this trial that he had never been in the room claimed to be rented to Goodson. Cross-examination, which proceeded without objection, refined this somewhat to a claim that he had not been in Goodson's room until after he was arrested on the prior charge and escorted to the room by a police officer. In rebuttal, the Government introduced a portion of the transcript from appellant's first trial showing that he testified then that he entered Goodson's room and discovered the counterfeiting equipment *prior* to his first arrest. The Government's cross-examination and rebuttal evidence were entirely proper, as they went to the issue of appellant's credibility on subject matter initiated by the defense. *See* United States v. Vivero, *supra,* 413 F.2d at 972; C. McCormick, *supra,* § 190 at 452. The trial court, moreover, carefully instructed the jury several times that it was not to retry the appellant on the charge of which he had been acquitted, but only to consider the inconsistent statements on the issue of appellant's credibility. Under the circumstances, there was no error.

Judgment affirmed.