**UNITED STATES of America,**
**Appellee,**

v.

**Gus SCLAFANI and Ben Ross,**
**Appellants.**

Nos. 828, 829, Dockets 73–1017, 73–1048.

United States Court of Appeals,
Second Circuit.

Argued May 10, 1973.

Decided June 27, 1973.

Certiorari Denied Nov. 12, 1973.

Henry J. Boitel, New York City, for appellant Sclafani.

Roy M. Cohn, New York City, (Gretchen White Oberman, and Saxe, Bacon, Bolan & Manley, New York City, on the brief), for appellant Ross.

William I. Aronwald, Sp. Atty., Organized Crime and Racketeering Section, Dept. of Justice, Washington, D. C. (Whitney North Seymour, Jr., U. S. Atty., and John W. Nields, Jr., Asst. U. S. Atty., New York City, on the brief), for appellee.

Before SMITH, MULLIGAN and TIMBERS, Circuit Judges.

TIMBERS, Circuit Judge:

Appellants Gus Sclafani and Ben Ross appeal from judgments of conviction entered upon jury verdicts returned October 6, 1972 after a nineteen day trial before Edmund L. Palmieri, *District Judge*, in the Southern District of New York.

Sclafani was convicted on three counts of loansharking, in violation of the Extortionate Credit Transaction Act of 1968, 18 U.S.C. §§ 893 and 894 (1970);

on one count of conspiring to finance an extortionate credit transaction, in violation of 18 U.S.C. § 371 (1970); on two counts of income tax evasion, in violation of 26 U.S.C. § 7201 (1970); and on one count of making a false statement, in violation of 18 U.S.C. § 1001 (1970). On December 4, 1972, an effective sentence of ten years imprisonment and a $30,000 fine was imposed on Sclafani.

Ross was convicted on two counts of loansharking, in violation of the Extortionate Credit Transaction Act; on one count of conspiring to finance an extortionate credit transaction; on three counts of income tax evasion; and on three counts of filing false and fraudulent income tax returns, the latter in violation of 26 U.S.C. § 7206(1) (1970). On December 11, 1972, an effective sentence of fifteen years imprisonment and a $90,000 fine was imposed on Ross.[1]

The chief claim of error raised on appeal by both appellants is that they were precluded from calling a co-defendant as a witness at their trial because of certain remarks made by the trial judge in accepting the co-defendant's change of plea and in sentencing him several months before the trial began. Other subordinate claims of error are raised by both appellants.

We affirm.

## I.

### EVENTS LEADING TO INDICTMENT

In view of the issues raised on appeal, a summary description of the loansharking scheme of considerable dimensions which constituted the core of this case, and the conduct for which appellants were convicted, will suffice.

The scheme in substance was that appellants loaned ever increasing sums of money to two borrowers at enormous rates of interest. They proceeded to collect the interest and other payments by threats of death, maiming and other violence. The exorbitant interest rates and other terms of extortion, rather than alleviating the borrowers' financial difficulties, forced them to borrow additional amounts. This continued to compound the plight of the victims. Eventually, faced with still further threats of physical injury and death, the victims turned to the FBI.

The sequence of events that led to the instant indictment began with the financial problems of Morton Kanof and Herbert Hurwitz, two contractors specializing in ghetto building reconstruction. In July 1968, Kanof and Hurwitz, who were then in need of $25,000, were put in touch with defendant Joseph Randazzo. He agreed to lend them the sum on these terms: interest at 3% per week; principal repayment in amount of $100 per week; two bogus payroll checks, each in amount of $125 per week, one of which was to go to defendant Joseph Maida; and a $2,000 bonus to Randazzo.

By October 7, Randazzo had delivered $10,000 of the $25,000 promised. Nevertheless, Kanof and Hurwitz were required to make payments pursuant to the original agreement. Subsequent deliveries of money and revisions of the loan resulted in the borrowers making payments in amount of $930 per week by the end of 1968.

Beginning February 1969, the borrowers' payment checks started to bounce. They encountered increasing difficulty in making the required payments. Randazzo began threatening them at gunpoint, purportedly on orders from higher up.

In June 1969, Randazzo introduced Hurwitz to appellant Sclafani as the person who was to receive all further payments. Hurwitz was informed by

---

1. The indictment was returned November 3, 1971 (the "extortion indictment", to be distinguished from the "obstruction of justice indictment", referred to below). It charged defendants Vincent Lore, Joseph Maida, Joseph Randazzo and Angelo Tuminaro, as well as the two appellants, with various violations. Prior to trial, Lore, Maida and Randazzo entered pleas of guilty. Tuminaro was a fugitive. The trial proceeded against Sclafani and Ross as defendants.

Sclafani that he "breaks legs, arms and heads" when necessary.

By late July 1969, Kanof and Hurwitz were in need of an additional $50,000. They had a meeting with Randazzo and Maida, at which it was agreed that this further sum would be loaned on these terms: the total principal would be computed as $100,000; interest at 3% per week would be paid on that principal amount; and four bogus payroll checks per week, each in amount of $175, would be required. The additional $50,000 was delivered to the borrowers by Sclafani and Maida in three installments by October 24, 1969. At that point the required weekly *interest* payments were in amount of $3,000.

In December 1969, Kanof and Hurwitz again encountered difficulty in making payments. Maida informed them that he was in trouble with his people. He introduced Kanof and Hurwitz to defendant Vincent Lore who made some direct threats and ordered prompt payment of the arrearage.

At a subsequent meeting between Maida, Lore and the two borrowers, the latter requested a further $10,000 loan with which to make their back-payments. The loan was arranged at $4,000 interest to be paid over a four week period.

In March 1970, payments by Kanof and Hurwitz again became sporadic. This led to further threats from Lore. At Lore's direction, a subcontract was entered into between the borrowers' company and C & P Painting. The latter was controlled by defendant Angelo Tuminaro and appellant Ross' son-in-law, among others. The company was identified by Lore as "my friends". The subcontract turned out to be a no-profit contract for the borrowers. After one week, the subcontract was breached by C & P. Lore arranged several meetings between the principals at C & P's offices; and at each meeting Lore left the borrowers to converse with Ross.

From that point on, there were frequent defaults in payments on the part of Kanof and Hurwitz. On May 4, Lore instructed the borrowers to deliver the payment for that week at a specified site or they would be killed. That payment was made as directed.

Shortly thereafter, Kanof and Hurwitz obtained some stock upon which they hoped to be able to obtain a loan. They informed Lore. He directed them to go to a particular bank branch and to inform a specified officer that they had been sent by Ross. The instructions were followed, but the bank refused to make a loan on the stock.

In June, in addition to the weekly payments, Lore demanded and received from the borrowers some $500 worth of plumbing fixtures. Also during June, Lore directed Kanof to determine the feasibility of converting a certain Brooklyn building into a drug rehabilitation or day care center in satisfaction of the back-payments due. It was later learned that the building was owned by a corporation of which Ross and Tuminaro were the principals. When the proposed conversion proved unfeasible, Lore told the borrowers to forget they had ever seen the building.

The demands upon the borrowers continued. At one point Lore actually bit Kanof's hand and threatened to gouge out Hurwitz's eyes. Gunpoint confrontations followed. At another time, Lore stabbed Kanof's hand with a table fork and bit Kanof's face.

On August 11, following some further inquiries into the value of a Brooklyn building owned by the borrowers, Lore directed that the mortgage on that building be transferred to Ross' daughter. Sometime around that date the borrowers met Tuminaro for the first time. At this meeting, Tuminaro told them that Lore had been too easy on them and that if they were really having trouble raising money they should rob a bank. Tuminaro said that he and Lore would supply a gun.

Lore subsequently suggested to Kanof that he take out an insurance policy on Hurwitz's life in the amount owed and that Lore and his people would arrange for Hurwitz's death.

On October 15, Lore directed the borrowers to execute the mortgage assignment on their Brooklyn building to appellant Ross, not to his daughter. The assignment was executed accordingly and was recorded.

On November 3, Kanof and Hurwitz were given an ultimatum by Lore that unless they came up with $10,000 they would both be killed. Kanof and Hurwitz went to the FBI. On November 4, a conversation was taped in which Lore repeated his threats of the day before. On the following day, the borrowers met Maida and Lore while under FBI surveillance. Maida and Lore thereupon were arrested.

By July 1971, Sclafani and Randazzo also had been arrested. The original extortion indictment was returned against those four, as well as against Tuminaro who at that time was a fugitive.

In August 1971, the four who had been arrested were released on bail. Lore and Tuminaro met with Ross. The FBI investigation was the topic of discussion. Ross referred to the $50,000 that "we" had loaned to Hurwitz. A meeting with the borrowers was then sought in an attempt to change at least Hurwitz's testimony. This resulted in a separate indictment returned September 16, 1971 charging Lore, Ross and Tuminaro with obstruction of justice (the "obstruction of justice indictment").

The instant extortion indictment against Lore, Maida, Randazzo, Tuminaro, Sclafani and Ross was returned November 3, 1971.

At the trial of the extortion indictment, Sclafani did not testify and called no witnesses. Ross did testify and he called three witnesses. His defense in substance was a denial of any knowledge of the scheme or any connection therewith, together with the assertion that one Hymie Rabinowitz (who was dead at the time of trial) was the kingpin and not Ross.

There was a great deal of other evidence adduced at the four week trial. The evidence of course must be viewed in the light most favorable to the government at this stage of the case. United States v. D'Avanzo, 443 F.2d 1224, 1225 (2 Cir.), cert. denied, 404 U.S. 850 (1971). Ross does not challenge the sufficiency of the evidence at all, as his counsel made very clear to us at the argument of this appeal. Nor does Sclafani, with the exception of certain claims with respect to the income tax evasion counts and counts 3 and 4 which charge violations of 18 U.S.C. § 893.

We hold that the evidence overwhelmingly and conclusively established the guilt of both appellants on all counts upon which they were convicted.

## II.

### CLAIM THAT APPELLANTS WERE PRECLUDED FROM CALLING CO-DEFENDANT LORE AS A TRIAL WITNESS

We turn directly to the chief claim of error raised on appeal by both appellants: that they were precluded from calling co-defendant Lore as a witness at their trial because of certain remarks made by the trial judge—some three to five months before the trial—in accepting Lore's change of plea and in sentencing him. A summary of the proceedings in the trial court involving this claim is necessary to an understanding of our ruling thereon.

On November 16, 1971, a not guilty plea had been entered by the court on behalf of Lore to each of the nine counts in which he was named in the extortion indictment.

On April 3, 1972,[2] accompanied by counsel, Lore appeared before Judge Palmieri, withdrew his not guilty pleas and pled guilty to count 3 (conspiracy to finance an extortionate credit transac-

---

2. At this time, the trial was scheduled to begin on April 17.

tion) and to count 11 (income tax evasion). At the same time, he pled guilty to one count of conspiracy to obstruct justice as charged in the separate indictment returned September 16, 1971 against Lore, Ross and Tuminaro. Before accepting Lore's guilty pleas, Judge Palmieri conducted an exhaustive voir dire by personally addressing Lore, pursuant to Fed.R.Crim.P. 11, to determine whether there was a factual basis for the pleas and whether they were made voluntarily with understanding of the nature of the charges and the consequences of the pleas. During the course of the voir dire, Lore acknowledged the correctness of transcripts of tape recordings squarely implicating him in many of the essential transactions involved in the counts to which he was pleading guilty. A presentence report was ordered and sentencing was tentatively scheduled for May 17.

On the same day, April 3, another codefendant, Maida, pled guilty to counts 3 and 7 of the extortion indictment which charged him with the same corresponding offenses as those to which Lore pled guilty. Judge Palmieri conducted a similar voir dire of Maida. Sentencing of Maida also was tentatively scheduled for May 17.[3]

At the conclusion of the change of plea proceedings on April 3, Judge Palmieri, at the request of government counsel, cautioned both Lore and Maida to stay away from any prospective witness in the case.[4]

Following the death of Lore's father and the postponement of Lore's sentencing, counsel for Lore moved on June 12 for imposition of sentence before the end of the month, without waiting for the conclusion of the trial of Sclafani and Ross which in the meanwhile had been further postponed. Lore had written a letter to Judge Palmieri on May 27 stating that the death of his father had left him responsible for his mother as well as his wife and two children; and that he was anxious to straighten out his life by paying whatever penalty he had to pay and getting it over with. Judge Palmieri was "very deeply impressed by this young man's desire to square himself with God and family . . . . " He indicated that he was inclined to grant Lore's motion for imposition of sentence.

The government initially opposed having Lore sentenced before the trial was concluded. Government counsel pointed out that the court would be in a better position to sentence Lore after it had heard the trial evidence; and that, if Lore should testify at the trial, the court could take that into consideration in imposing sentence, including any false testimony.

Judge Palmieri then made this proposal:

"THE COURT: I have a way out of that. I can impose a sentence that I think he ought to have on one of the counts and I can leave the other count open with a reservation that if he

---

3. Maida later was sentenced, on November 21, 1972, to consecutive three year terms of imprisonment on each of counts 3 and 7 of the extortion indictment. He was fined a total of $5,000.

4. The government's request and Judge Palmieri's instructions to Lore and Maida were as follows:

"MR. ARONWALD: Your Honor, I would ask your Honor just one thing, and that is to reiterate your previous instructions to the defendant Lore and also to the defendant Maida, that although they have now entered pleas of guilty, they are still to stay away from any witness or prospective wit-

ness in this case, most particularly Hurwitz and Kanof.

THE COURT: Yes, I instruct you both, Joseph Maida and Vincent Lore, to stay away from anybody connected with these cases.

This case is going to go to trial on April 17, and any approaches you make, friendly or otherwise, will be construed to your prejudice. So just stay away from them like poison.

You understand that, Joseph Maida?

DEFENDANT MAIDA: Yes, sir.

THE COURT: You understand that, Vincent Lore?

DEFENDANT LORE: Yes, sir.

THE COURT: All right."

takes the stand and commits perjury I would take into account all of the subsequent conduct with respect to the other count.

If I had no reason to suspect this man was acting in bad faith, but was trying to unburden his soul of his problem, then I would just make the sentence concurrent with the other count."

After some further colloquy, the court indicated that it intended on June 28 to sentence Lore on the two counts in the extortion indictment to which he had pled guilty, and to defer imposition of sentence on the obstruction of justice count until after the trial was concluded. Counsel for the government and counsel for Lore agreed to this procedure. The case was continued to June 28 for sentencing.[5]

On June 28, Lore was sentenced, pursuant to 18 U.S.C. § 4208(a)(2)(1970), to concurrent four year terms of imprisonment on each of the extortion indictment counts to which he had pled guilty. Judge Palmieri then said, "The sentence on the obstruction of justice indictment . . . will remain open, and I postpone sentence sine die on that, to abide the disposition of the trials and pleas of the other co-defendants." On motion of the government, the remaining seven counts of the extortion indictment were dismissed as against Lore.

In his remarks to the court on June 28 before sentence was imposed, Lore's counsel stated:

". . . I know it is my feeling that in any trial here Mr. Lore should stay absolutely as far away from participating as the law would permit. If Mr. Aronwald or anybody else feels that a subpoena is appropriate, to have him come, we will come and he will testify and he will tell the truth. But other than that, your Honor, he has no intention of being a voluntary participant for anybody. I don't think that this is at all inappropriate, given the circumstances, and I don't think that it should weigh one way or the other. If Mr. Aronwald wants to subpoena him and put him on the stand, he is going to tell the truth, but it is not his intention to come for anybody."

In like vein, Judge Palmieri said to Lore immediately before imposing sentence:

"Your attorney told me that he hopes that you will stay as far away as possible from the unfinished cases, and I hope that will be true. I hope that you will have the courage and the strength to tear out the roots that you have in this community, because I think that they are like an infected sore. I think that you have been brought up, up to this point, exposed to crime and with people involved in crime, and as long as you stay within shouting distance or even communication distance of these people your future is going to be tainted and infected. I think that you ought to find new horizons in a new community, far

---

5.  At the June 12 hearing, Judge Palmieri asked Lore's counsel whether he had "any idea what [Lore's] disposition is with respect to testifying at this trial as a witness for the defendants?" Counsel said, "I don't know. I have not conferred with him." Judge Palmieri then stated:

"THE COURT: It would be better if he had nothing to do with it. I don't want to deprive anybody of the right to call witnesses. It is a God-given right. The government could call him, just as they could. But I think from his standpoint it would be better if he had as little to do with the case as possible."

Lore's counsel responded, "That would be true from his point of view."

This colloquy immediately followed a statement by government counsel reminding the court of Lore's conduct, subsequent to the return of the first extortion indictment, of intimidating government witnesses: "With respect to the two witnesses in this case, the government witnesses, only because of Mr. Lore's overt acts of intimidating, has the government been forced since that time to place both of those people and the respective members of their families in protective custody at tremendous cost to the government. If Mr. Lore had not approached either one of them, that would not have been necessary." See note 4, *supra*.

away from the one in which you have lived and to find new strength and new rewards far away from the people who have poisoned your existence and placed you on the road of delinquency."

Based on the foregoing, both appellants argue that they were precluded from calling co-defendant Lore as a trial witness and consequently were denied due process of law in violation of the Fifth Amendment and their right to compulsory process in violation of the Sixth Amendment. We disagree.

■ First, with respect to the procedure followed by Judge Palmieri in leaving open the imposition of sentence on Lore on the obstruction of justice count until "the disposition of the trials and pleas of the other co-defendants", this clearly was within the discretion of the trial judge. Postponement of sentencing a defendant who pleads guilty until the conclusion of the trial of remaining co-defendants is done as a matter of course by trial judges, especially when requested by the government. Here Judge Palmieri was confronted with competing claims: the government requested that sentencing on all counts be deferred until the conclusion of the trial; Lore's counsel requested immediate imposition of sentence on all counts. For the reasons stated by Judge Palmieri on the record, we hold that his accommodation of the competing interests by imposing sentence on the two extortion indictment counts and leaving open the imposition of sentence on the obstruction of justice indictment count was not an abuse of discretion.

Second, the record shows that Lore at all times was available to be subpoenaed as a witness by appellants, but that they chose not to do so. At the sentencing of Lore on June 28, his counsel said to the court: "If Mr. Aronwald or anybody else feels that a subpoena is appropriate, to have him come, we will come and he will testify and he will tell the truth." At the proceedings on June 12, Judge Palmieri had stated: "I don't want to

deprive anybody of the right to call witnesses. It is a God-given right. The government could call him, just as [the defendants] could." On the first day of trial, September 11, Lore's counsel came to the courtroom at Judge Palmieri's request and stated it was Lore's position "that if he were subpoenaed he would tell the truth but other than that he doesn't want anything to do with it." In response Judge Palmieri said:

"THE COURT (addressing Lore's counsel): Have you advised him that he is not immune from the service of subpoena and that he can be brought to court and questioned and has no right to claim immunity in this case and if counsel chooses to question him without prior conference, they have a right to do so?

Does he realize he is under that Sword of Damocles?

MR. OWEN (Lore's counsel): He knows he can be subpoenaed and brought here. Whether he has certain Fifth Amendment rights given the nature of the questioning, I don't know.

THE COURT: To the extent that any question would relate to this case, I don't see how he can claim Fifth Amendment rights.

* * *

THE COURT (addressing appellant Ross' counsel): Now, we have the same problem with this defendant [Lore]. It is not an unusual problem. He has pleaded guilty to the very charges leveled against your client and it is surprising to me that you feel he is your hope for exculpation. If you want him, his body will be produced but I can't force him to confer with you."

Despite the availability of Lore to be subpoenaed as a witness and the emphatic indication by Judge Palmieri that he would be required to testify if subpoenaed, neither Sclafani nor Ross ever subpoenaed him. And there was no doubt as to Lore's whereabouts, for he had been incarcerated since his surren-

der on July 5, following the imposition of sentence on June 28.

Third, the record demonstrates, both directly and by strong inference, that there were compelling reasons (other than Judge Palmieri's remarks) why neither appellant chose to call Lore as a trial witness. As a co-defendant, Lore had pled guilty to the charge of having conspired with both Sclafani and Ross to finance an extortionate credit transaction, and of having conspired with Ross to obstruct justice. Experience on the trial bench has taught that rarely if ever do defendants charged with conspiracy call as a witness on their behalf a co-defendant who has pled guilty to the very conspiracy for which defendants are on trial. That inhibition would appear to have been particularly strong here since appellants knew that at the time of Lore's change of plea on April 3 he had acknowledged, during the voir dire conducted by the court, the correctness of transcripts of tape recordings squarely implicating him in many of the essential transactions involved in the counts to which he was pleading guilty. The summary set forth above of the loansharking scheme at the core of this case indicates the depth of Lore's involvement, and particularly his dominant role in committing acts of violence.[6] It

is understandable therefore that Sclafani's trial counsel, after listening to tape recorded conversations between Lore and the government's key witnesses, felt that it would be harmful to Sclafani's case if Lore were called on his behalf; and, accordingly, on the first day of the trial, September 11, he advised Judge Palmieri that "I had decided that, under no circumstances, would I call Vincent Lore, a co-defendant, as a witness for, or on behalf of, my client." [7] Ross' trial counsel, on the sixth day of the trial, September 19, informed Judge Palmieri that Lore's counsel had told him that Lore would be willing to confer with Ross' counsel and that he "would testify to exculpate Ross." The record is silent as to whether Ross' trial counsel ever did confer with Lore. But Lore was not called as a witness by either Sclafani or Ross. As we recently observed in a closely analogous situation, " '[i]f any general inference is to be drawn from the entire transcript . . . it would be that if either side had been disposed to call [the] witness it would have been the Government and that the probability that, after interview, the defendants would have decided not to call [the] witness is all but overwhelming.' " United States v. Mosca, 475 F.2d 1052, 1059 (2 Cir.), cert. denied, 412 U.S. 948 (1973).[8]

---

6. At the sentencing of Lore on June 28, government counsel, in urging the imposition of maximum consecutive sentences, informed the court:

  " . . . I tell your Honor that it is Mr. Lore and Mr. Lore predominantly that displayed acts of violence to these two victims. Mr. Lore on several occasions inflicted bodily injury and physical harm to these victims.

  Mr. Lore, and Mr. Lore only, inflicted fear in the heart of Mr. [Kanof's] wife by going out to her home after this indictment had been returned and intimidating or placing fear in the heart of her daughter, who was in the house alone when her mother and father were out, by coming to the house to talk to her father, to talk to him about what? To talk to him about cooperating with Mr. Lore and his co-defendants in changing his testimony in this case."

7. Counsel for both appellants have addressed numerous communications to us urging that we strike from the record an affidavit sworn to March 26, 1973 by Sclafani's trial counsel, Jack Evseroff, Esq., confirming this statement to the trial judge. We decline to do so, for the reasons (1) that the affidavit in question was certified and transmitted to this Court in accordance with Fed.R.App.P. 10(e), including an order of Judge Palmieri entered April 6, 1973 directing that the affidavit be docketed and made part of the record in this Court; and (2) that we would reach the same conclusion, absent the Evseroff affidavit, since it does no more than confirm what the record shows anyway—that Lore was not called as a witness for the compelling reasons stated above.

8. In *Mosca*, we rejected appellants' claims that they had been denied due process and

■ Fourth, Judge Palmieri's remarks at the proceedings on June 12 that " . . . I think from his standpoint it would be better if he had as little to do with the case as possible",[9] under the circumstances were neither threatening nor harassing nor did they effectively drive Lore as a witness off the stand. Such remarks, considered fairly and in context, obviously were intended to caution Lore against further association with those who had gotten him into trouble in this case—"the people who have poisoned your existence and placed you on the road of delinquency." See Judge Palmieri's sentencing remarks on June 28, *supra*. Earlier, at the time of Lore's change of plea on April 3, both Lore and Maida had been instructed "to stay away from any witness or prospective witness in this case." See note 4, *supra*. Such cautionary remarks and instructions clearly were justified by Lore's record of having intimidated government witnesses subsequent to the original extortion indictment, see note 5, *supra,* and of having attempted to talk to one of the victim witnesses "about cooperating with Mr. Lore and his co-defendants in changing his testimony in this case." See note 6, *supra.* But balanced against these cautionary remarks were Judge Palmieri's repeated

and emphatic statements that Lore was available as a witness to either side and that he would be required to testify if subpoenaed. And Lore's own counsel made it abundantly clear that, while Lore had "no intention of being a voluntary participant for anybody", nevertheless "[i]f [government counsel] or anybody else feels that a subpoena is appropriate, to have him come, we will come and he will testify and he will tell the truth." See remarks by Lore's counsel at the sentencing of Lore on June 28, *supra*. In short, the record demonstrates beyond any doubt whatsoever in our minds that this is not a case where "the judge's threatening remarks, directed alone at the single witness for the defense, effectively drove that witness off the stand." Webb v. Texas, 409 U.S. 95, 98 (1972) (per curiam).[10] Rather, this is a case where Lore did not appear as a witness because neither appellant chose to call him—for compelling reasons wholly aside from Judge Palmieri's remarks.

■ Finally, for essentially the reasons discussed in detail above, we are satisfied that no substantial right or interest of either appellant was prejudiced by the remarks of Judge Palmieri to codefendant Lore at his change of plea proceedings in April or at his sentencing

the right to compulsory process resulting from the government's failure upon request to make available at trial a potential witness whose whereabouts was known to the government but not to appellants.

9. We consider these remarks in conjunction with the judge's similar remarks at the sentencing of Lore on June 28: "Your attorney told me that he hopes that you will stay as far away as possible from the unfinished cases, and I hope that will be true."

10. In our view, appellants' massive reliance upon *Webb* is misplaced. All else aside, unlike "the sole witness for the defense" in *Webb*, Lore was a co-defendant who had pled guilty to the very conspiracy for which appellants were on trial. And, unlike the "threatening and harassing" remarks of the trial judge in *Webb* in "coercing the only defense witness into refusing to testify", our careful reading of Judge Palmieri's remarks in the instant case in context leaves us with the firm

conviction that they in no way threatened or harassed the witness, nor can they fairly be construed as having coerced the witness into refusing to testify.

Although the Supreme Court decided *Webb* on December 4, 1972—the day upon which Sclafani was sentenced in the instant case—the principle which is controlling here has long been recognized in this Circuit. See, e. g., United States v. Marzano, 149 F.2d 923, 926 (2 Cir. 1945) (L. Hand) : "It is true that a person who has pleaded guilty and has not yet been sentenced may testify; it is also true that such a witness always hopes that by testifying he will lessen his punishment; but he is not told that his testimony must be satisfactory to the court to secure any favor; and it would be altogether intolerable, if he were."

We agree; and we hold that by no stretch can Judge Palmieri's remarks be construed as having told Lore "that his testimony must be satisfactory to the court to secure any favor."

proceedings in June. Even assuming arguendo—contrary to our holding—that appellants were precluded from calling Lore as a trial witness because of the remarks of the trial judge, our careful examination of the entire transcript of this nineteen day trial convinces us that Lore's testimony could not conceivably have been helpful to appellants and it most assuredly would not have changed the result. Thus, "we are left with the firm conviction that [his] testimony . . . would have had no effect on the outcome of the case, except possibly to strengthen the government's evidence . . . ." United States v. Mosca, *supra*, 475 F.2d at 1060. The evidence of both appellants' guilt in this case is not only overwhelming; it is conclusive. Appellant Ross does not challenge the sufficiency of the evidence at all.[11] Appellant Sclafani challenges its sufficiency only in respects which are here immaterial. We hold that Judge Palmieri's remarks, if error at all, were harmless, for we can say with fair assurance, "after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error . . . ." Kotteakos v. United States, 328 U.S. 750, 765 (1946). See Cohen v. Franchard Corp., 478 F.2d 115, 125 (2 Cir.), cert. denied, 414 U.S. 857 (1973); United States v. Mosca, *supra*, 475 F.2d at 1058; United States v. McCarthy, 473 F.2d 300, 308 (2 Cir. 1972); United States v. Ellis, 461 F.2d 962, 970 (2 Cir.), cert. denied, 409 U.S. 866 (1972).

## III.

### CLAIM OF MISCONDUCT BY TRIAL JUDGE

The only other claim of error which warrants brief mention—primarily in

fairness to the trial judge—is the contention by both appellants that misconduct by the trial judge precluded a fair trial. This claim focuses upon three aspects of the proceedings below: (1) denial of a motion to disqualify the judge; (2) conduct of the trial itself; and (3) the charge. We find no merit in any aspect of this claim.

### (1) *Motion To Disqualify*

On August 30, 1972—twelve days before the trial was scheduled to begin— appellant Ross filed a motion to disqualify Judge Palmieri pursuant to 28 U.S.C. § 144 (1970). The motion was accompanied by a seven page affidavit by Ross' attorney and a one paragraph affidavit by Ross himself which adopted "[e]verything set forth in Mr. Goldberg's affidavit." The motion sought to disqualify the judge on the ground that remarks made by him at the sentencing of Lore two months earlier had manifested a personal bias against Ross. Judge Palmieri denied the motion in a written memorandum filed August 30. We hold that the motion was properly denied.

Disqualification is warranted and appropriate only if the alleged bias and prejudice stems from an extrajudicial source and has resulted in the formulation of an opinion on the merits not based upon what the judge has learned by his participation in the proceedings before him—a situation totally absent here. United States v. Grinnell Corp., 384 U.S. 563, 583 (1966).

A judge is duty-bound not to disqualify himself upon such a legally insufficient ground as that urged by Ross below. Rosen v. Sugarman, 357 F. 2d 794, 797 (2 Cir. 1966); In re Union

11. We regard as little short of fanciful Ross' assertion on appeal that, if Lore had been called as a trial witness, he would have testified that one Hymie Rabinowitz (who was dead at the time of trial), rather than Ross, had loaned the money to Kanof and Hurwitz. True, Lore had made a statement to this effect at the time of his change of plea on April 3. But co-defendant Maida had made a similar statement on the same occasion; in

deed, Maida was even more specific in stating that he had received $50,000 from Rabinowitz, that he delivered that sum to Kanof and Hurwitz, and that he and Lore were responsible for collecting the interest and repayments of principal from the borrowers.

Significantly, Maida was not called as a defense witness at trial. And it is not claimed that he was deterred from testifying by any remarks of the trial judge.

Leader Corp., 292 F.2d 381, 391 (1 Cir.), cert. denied, 368 U.S. 927 (1961); Town of East Haven v. Eastern Airlines, Inc., 293 F.Supp. 184, 189 (D.Conn. 1968); United States ex rel. Rogers v. Richmond, 178 F.Supp. 44, 48 (D.Conn. 1958).

### (2) Conduct of Trial

■ Appellant Ross, joined to some extent by appellant Sclafani, has mounted a massive attack upon the conduct of the trial by Judge Palmieri. The claim in essence is that the judge so interfered with the course of the trial and demonstrated such bias against appellants as to preclude a fair trial.

In view of the nature of appellants' claimed error in this regard and the vehemence with which the claim is asserted, we have carefully examined the entire trial transcript of more than 3200 pages covering this nineteen day trial. Daley v. United States, 321 F.2d 123, 128 (1 Cir.), cert. denied, 351 U.S. 964 (1956).

Based on our scrutiny of the record from cover to cover, we have reached the following conclusions:

(1) The conduct of the trial judge complained of was far from unprovoked by defense counsel.[12]

(2) The trial judge's remarks admonishing counsel for conduct which he believed to be improper were made, with very few exceptions, out of the presence of the jury—a distinction which unfortunately the briefs on appeal fail to make clear. See United States v. Boatner, 478 F.2d 737, 741 (2 Cir. 1973).

(3) In every instance complained of, where the judge either questioned a witness himself or interrupted counsel's questioning of a witness, we are satisfied that the judge was doing his very best to clarify the issues and assist the jury in understanding the evidence. In short, the judge did precisely what we sanctioned in

United States v. DeSisto, 289 F. 2d 833, 834 (2 Cir. 1961):

"A trial judge in criminal, as in civil, cases may, indeed must, be more than a mere moderator or umpire in a contest between two parties in an arena before him. He should take part where necessary to clarify testimony and assist the jury in understanding the evidence and its task of weighing it in the resolution of issues of fact."

(4) We have not found a single instance of conduct on the part of the judge in this voluminous record covering the four week trial which, considered in context and in fairness to all parties, in any way prejudiced either appellant or displayed the slightest bias against them.

We hold that the conduct of the trial judge did not deprive appellants of a fair trial. Cohen v. Franchard Corp., supra, 478 F.2d at 125; United States v. McCarthy, supra, 473 F.2d at 307–08; United States v. D'Anna, 450 F.2d 1201, 1206 (2 Cir. 1971); United States v. DeSisto, supra, 289 F.2d at 834; Daley v. United States, supra, 231 F.2d at 130.

### (3) The Charge

Appellants' attack upon the charge is based essentially on the claim that it was slanted in favor of the government and displayed bias against appellants. We have scrupulously examined the entire charge which occupies 130 pages of the transcript. We find no merit in appellants' claim.

The judge's summary of the evidence was entirely in keeping with our repeated suggestions to trial judges, particularly in a conspiracy case with multiple counts and multiple defendants. In summarizing the evidence and in commenting upon it, the judge exercised great care in reminding the jury that it was their recollection that controlled and not that of the court.

---

12. Both appellants were represented at trial by counsel other than their counsel on appeal.

The instructions on the credibility of witnesses were in accordance with standards uniformly approved by us and, in our view, were especially appropriate in this case, including the instruction by which the credibility of a defendant who takes the stand is to be evaluated. See United States v. Mahler, 363 F.2d 673, 678 (2 Cir. 1966), and authorities cited.

In short, upon the entire record, we hold that the trial judge did "remain the judge, impartial, judicious, and, above all, responsible for a courtroom atmosphere in which guilt or innocence [was] soberly and fairly tested." United States v. Brandt, 196 F.2d 653, 655–56 (2 Cir. 1952).

## IV.

### OTHER CLAIMS

Finally, we have carefully considered each of appellants' other claims of error. We find no merit in any of them either separately or cumulatively.

Appellants were convicted of serious crimes after a fair trial on the basis of overwhelming evidence.

Affirmed.