**UNITED STATES of America,**
**Appellee,**

**.v.**

**James KAYLOR and Willie Glen**
**Hopkins, Appellants.**

**No. 1048, Docket 73–1530.**

United States Court of Appeals,
Second Circuit.

Argued July 17, 1973.

Decided Oct. 15, 1973.

Michael J. Gillen, Brooklyn, N. Y., for appellant Kaylor.

Mark A. Landsman, Brooklyn, N. Y. (Lawrence Stern, New York City, of counsel), for appellant Hopkins.

Kenneth J. Kaplan, Asst. U. S. Atty. (Robert A. Morse, U. S. Atty. E. D. N. Y., L. Kevin Sheridan, Asst. U. S. Atty.), for appellee.

Before MOORE and OAKES, Circuit Judges; GURFEIN,* District Judge.

OAKES, Circuit Judge:

This appeal arises out of convictions for the theft of a tractor-trailer containing a shipment of 49 head of hung beef valued on July 20, 1972, the time of the theft, at $22,000. The convictions were on a substantive count of stealing, with intent to convert to appellants' own use (18 U.S.C. § 659), the tractor-trailer, which was traveling in interstate commerce from Dakota City, Nebraska, to

---

* Hon. Murray I. Gurfein, United States District Judge for the Southern District of New York, sitting by designation.

the Jamaica Wholesalers in Jamaica, Queens. Appellant Kaylor was sentenced to a term of imprisonment of ten years and appellant Hopkins to one of seven years.

Appellant Kaylor claims that the trial court's conduct deprived him of a fair trial, that there was not competent evidence before the grand jury identifying him so as to support an indictment, that the trial court erred in not suppressing the testimony of two witnesses who refused to identify him in court and that the trial court improperly received in evidence certain admissions by appellant. Appellant Hopkins argues that an in-court identification of him by the driver of the tractor-trailer was tainted by the fact that it had occurred after the witness had testified and when he was recalled after having seen appellant at the counsel table, and that the court erred in refusing to sentence appellant pursuant to the Youth Corrections Act and in refusing to consider possible recommendations of the sentencing panel which is operative in the Eastern District of New York.

Carl Wolverton, an over-the-road tractor-trailer driver, was the lucky fellow who arrived in Jamaica with the 49 beef carcasses all the way from Dakota City, Nebraska. He parked his truck, and at about 11 o'clock that night went for a few minutes to get a sandwich. When he returned to the truck, as he was about to "pick a little" at his guitar and lock the door to the cab, someone opened it, pointed a gun at his head and told him to get in the bunk at the back of the cab. One man held a gun in his ear and a second tied his arms and legs with rope and subsequently put white tape over his eyes and over the top of the rope. One of them roughed him up by hitting him "a few good clips" with the gun on his head, and after being driven around for a couple of hours and stripped to his underwear, Wolverton was thrown out of the cab of his tractor like a "sack of taters" into a Dodge van, and then hit, kicked and urinated upon. He was abandoned in the van and

worked himself free during the following morning.

The Dodge van had been stolen in Brooklyn the morning of the hijacking, and when found, the inside of the left front door bore the fingerprints of the appellant Hopkins. About 7:00 a.m. an alert New York City detective, John Flynn, saw a tractor-trailer at Hegeman and Logan Streets in Brooklyn and began to follow it, his suspicions aroused. He stopped it and asked for and received identification from the driver, but still was suspicious, so he followed the truck to a meat market. There five men in butcher's jackets were directing the vehicle into an alleyway. At this point Flynn called for assistance and proceeded toward the vehicle when the two people in the tractor-trailer broke and ran. Sure enough, the tractor-trailer turned out to be Wolverton's with the Dakota City load of beef. At trial Flynn identified appellant Hopkins as the helper he had observed in the truck. The other individual, the driver of the truck, has, however, never been apprehended.

The proprietors of the meat market to which the truck was being delivered were Charles Simonian and Nicholas Stolfi. While the tractor-trailer was approaching the entrance of the meat market, Simonian was standing at the back with an individual he knew as "Shorty," which also happens to be a nickname for appellant Kaylor. This individual was black and described by Simonian as about 5' 5" to 5' 8" with a stocky build and short cropped hair, 30 to 35 years old, and having no beard or moustache. "Shorty" had been around before to see if these butchers wanted to buy some meat. On that very morning "Shorty" had telephoned Simonian and told him that he had some meat for him, and the two had met in a luncheonette a few doors down the street and gone to the meat market when Simonian opened it. Simonian did not want the whole trailer load of meat because it was "too much."

Before the grand jury both Simonian and his partner, Stolfi, identified a pic-

ture of James Kaylor as the man they knew as "Shorty" when they were shown a spread of photographs. This picture of Kaylor, like their description of "Shorty," was of a man without a moustache or a beard. At the time of trial, however, while both of the butchers thought James Kaylor "looked like" or "resembled" "Shorty," they stated that Kaylor was not "Shorty." At the time of trial Kaylor had grown a moustache and beard, had longer hair and puffier cheeks and was somewhat heavier than the "Shorty" that he "looked like" or "resembled."

On December 15, 1972, after a special FBI agent had warned Kaylor of his constitutional rights, Kaylor told him that "If I get uptight enough about this case I can tell you about it," and that "I know about those two guys in the meat market and they should never have paid the police the $500."

At the trial, the tractor-trailer driver, Wolverton, appeared but during his original testimony was not asked whether he could identify either of the two defendants. When he left the stand, however, he went back to the witness room and told Detective Flynn that he could identify the hijackers. Before permitting him to testify, the court held a hearing on suggestiveness out of the presence of the jury and found that no impropriety or suggestiveness had occurred. The witness was permitted to retake the stand in the presence of the jury and he then identified the two defendants as the hijackers.

■ We have examined the record with some care in the light of United States v. Friedgoog, 69 Crim. 102 (E.D. N.Y., Dec. 1, 1972) (Rosling, J.), remanded, No. 73–1122 (2d Cir., Apr. 25, 1973) (mem.) and United States v. Nazzaro, 472 F.2d 302 (2d Cir. 1973). We do not find that the trial judge overstepped his duty "as more than a moderator to clarify ambiguous questions and testimony for the jury and to insure that the trial was fairly conducted." See United States v. Pellegrino, 470 F. 2d 1205, 1206 (2d Cir. 1972), cert. denied,, 411 U.S. 918, 93 S.Ct. 1556, 36 L. Ed.2d 310 (1937). See also United States v. Boatner, 478 F.2d 737, 740–741 (2d Cir. 1973). Appellant Kaylor's principal complaint is directed toward the interrogation by the court of the witnesses Simonian and Stolfi after their testimony that Kaylor resembled or looked like the "Shorty" they talked to, but was in fact not him. The court, quite correctly, we think inquired of the witnesses to determine in what respects their memories of the appearance of the "Shorty" they did see differed from that of the defendant Kaylor in court, especially since the photographic identification they had made was of a photograph of the appellant himself. True, the court referred to "the Shorty in the courtroom" but there was subsequent testimony by a New York City police officer that he had asked appellant Kaylor if his name was "Shorty" and Kaylor had replied that he was known by that name. The court did remark about the witness Stolfi's obvious nervousness *after* he had told the prosecutor he was "very, very nervous" and defense counsel had accused the prosecution of trying to inject "something of fear" into the case. All that the court did was to say that it was obvious that the witness was nervous or afraid, since he was stuttering, repeating himself and hesitating to answer, without in any way indicating any belief as to why the witness was afraid. Lastly, the court's inquiry of Stolfi whether his butcher shop was still in the neighborhood and whether his number was in the phone book would give some explanation for the witness's nervousness, perhaps, but would not necessarily point toward appellant; as any trial judge knows, many witnesses are nervous especially when testifying in a case involving violence. It does not have to be the defendant who frightens the witness; indeed, if in fact there were another "Shorty" as appellant Kaylor claims, then the witness might have been fearful because he did *not* identify the appellant as "Shorty." In any case, the witness's fear was relevant.

■■ Suffice it to say that the evidence of Simonian and Stolfi identifying Kaylor as "Shorty" from photographs was sufficient to warrant Kaylor's indictment in light of the testimony before the grand jury that "Shorty" had offered to sell the meat in the hijacked trailer. This evidence indicated a "reasonable probability" that the crime of hijacking had been committed by Kaylor, and that is enough to warrant an indictment. *See* Carrado v. United States, 93 U.S. App.D.C. 183, 210 F.2d 712, 717, cert. denied sub nom. Atkins v. United States, 347 U.S. 1018, 74 S.Ct. 874, 90 L.Ed. 1140 (1954); Shusan v. United States, 117 F.2d 110, 113 (5th Cir.), cert. denied, 313 U.S. 574, 61 S.Ct. 1085, 85 L.Ed. 1531 (1941). Participation in a theft may be inferred from the possession of recently stolen goods. United States v. DeSisto, 329 F.2d 929, 935 (2d Cir.), cert. denied, 377 U.S. 979, 84 S.Ct. 1885, 12 L.Ed.2d 747 (1964). *See* Barnes v. United States, 412 U.S. 837, 93 S.Ct. 2357, 37 L.Ed. 380 (June 18, 1973).

■ The trial court properly allowed the testimony of Simonian and Stolfi at trial. The fact that they refused to make an identification then did not take away from their prior photographic identification. Simonian had selected Kaylor's photograph from a book of some 100–150 photos the very day he had seen "Shorty." Subsequently two photos (including the one previously selected) were included in a spread of nine from which both Simonian and Stolfi selected one, a front and side photo. There is no indication that there was impermissible suggestiveness despite the presence of two photos in the spread since the appearance of the photographed individual was apparently sufficiently different as to cause each of the two witnesses to select only the one photo. *Cf*. United States ex rel. Johnson v. Department of Correction, 461 F.2d 956 (2d Cir. 1972); United States v. Magnotti, 454 F.2d 1140 (2d Cir. 1972). Their testimony was guarded, to be sure, for reasons previously stated, but it cannot be said, as appellant claims, that the witnesses never really identified even the picture of Kaylor as the "Shorty" with the meat.

■ Appellant Kaylor complains that the court should not have admitted his statements to the FBI Special Agent made after Miranda warnings but in the absence of the attorney requested by Kaylor. But the statements or admissions were volunteered—one that "If I get uptight enough I can tell all about this case" and the other "I know about those two guys in the meat market and they should never have paid the police the $500." The first was made before Kaylor asked for an attorney and the second was volunteered after the Special Agent had concluded his background information interview. As such, neither Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), nor Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) is applicable. United States v. Gaynor, 472 F.2d 899 (2d Cir. 1973); United States v. Garcia, 377 F.2d 321, 324 (2d Cir.), cert. denied, 389 U.S. 991, 88 S.Ct 489, 19 L.Ed.2d 484 (1967).

■ Appellant Hopkins complains that the court permitted the trucker, Wolverton, to return to the stand and make an identification which he had not made in the first instance; the objection is based upon the suggestiveness of the situation since—had the defendant known there was going to be identification testimony—he would have moved (and the court stated that it would have granted such a motion) to have the defendant seated away from the counsel table. As it was, the identification of Hopkins amounted to a "show-up," but a "show-up" is not per se inadmissible or violative of due process, depending rather upon the totality of the circumstances, Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). It is quite apparent that the omission to adduce identification testimony from the witness on his first trip to the stand was a result of lack of preparation on

**1132**

the part of the prosecution ("we felt he could [not] identify them in court"), rather than to any bad faith, or an attempt to produce a show-up. United States v. Famulari, 447 F.2d 1377 (2d Cir. 1971). Here the witness, after he left the stand, volunteered to Detective Flynn that he had recognized the appellants as the hijackers. The court quite properly conducted a hearing in the jury's absence to determine whether there were taint by virtue of the viewing of the defendants for the first time in the courtroom, and satisfied itself that the witness was "forthright" and his testimony positive. He had had, he had previously testified, a minute and a half to see the hijackers at the time of the robbery, and his description of the appellants was accurate. The prosecution could have been forewarned, since the witness himself apparently thought he could make an identification, but its omission to ask the key questions, we believe as did the court below, was inadvertent.

We emphasize, in holding that there was not reversible error here, that there is not the slightest suggestion that the prosecution was in any way attempting to bring the confrontation about in the fashion that it occurred.

■ Appellant Hopkins seeks to have his conviction remanded for resentencing however, because the trial court made no affirmative *explicit* finding that appellant would "not derive benefit from treatment" under the Youth Corrections Act, 18 U.S.C. § 5010(d). This issue, unresolved in this circuit, *see* United States v. Guzman, 478 F.2d 759, 762 (2d Cir. 1973), has recently received en banc consideration in two other circuits. In Cox v. United States, 473 F.2d 334, 337 (4th Cir. 1973) (en banc), the Fourth Circuit stated that the "Youth Corrections Act must be used unless the sentencing judge finds that treatment under the Act would not be beneficial. That finding should be based upon reason . . . ." The Fourth Circuit, although remanding *Cox* to the district court for an explicit finding under §

5010(d) indicated that such a finding could be implied from a sufficient record. 473 F.2d at 337. A panel of the Ninth Circuit held that an implicit finding under § 5010(d) was sufficient; it nevertheless ordered the trial court to make a more explicit finding under that section upon remand. United States v. Jarratt, 471 F.2d 226, 230 (9th Cir. 1972). In United States v. Coefield, 476 F.2d 1152 (D.C.Cir. 1973) (9–1 decision, en banc), however, the District of Columbia Circuit held, *inter alia*, that "the finding required to be made under section 5010(d) as a condition to an adult sentence is to be explicit . . . ." *Id.* at 1158–1159.

■ My brethren go with *Cox* and *Jarratt* essentially in holding that an *implicit* finding is all that is required. They view—quite properly I think—that this record contains such an implicit finding in Judge Rosling's stating before verdict that he "always take[s]" youth offender eligibility "into consideration when sentence is to be imposed" and in the sentencing minutes in the course of which appellant Hopkins' counsel referred to the Youth Corrections Act and the court said, "In imposing sentence, which is not a light one, I have taken into account the fact that you were quite young at the time you committed the crime."

I disagree with this view and would as did the District of Columbia Circuit in *Coefield*, require an *explicit* finding. *See* 476 F.2d at 1158–1159. It is true that an omission to make an explicit finding is one more threshold to proper sentencing over which a district judge might trip. On the other hand, under the majority holding there may be quite a bit of appellate litigation over what is "implicit." The purpose to be served by the Youth Corrections Act, moreover, seems to me to require not only that there be an explicit finding in so many words that "the youth offender will not derive benefit from treatment," but also, as the District of Columbia court held, that the finding "must be supported by reasons from which it can be determined

that it [the finding] is consistent with the purposes of the Act." 476 F.2d at 1159 (footnote omitted). It is my view that the judge here sentenced on the basis of the aggravated nature of the crime, a matter which does not go at all to the question of benefit from treatment under the Act.

The majority necessarily is of the view that there was no error in the trial court's failure to consult with the sentencing panel in the Eastern District on the basis that the function of the non-sentencing judges on the panel is purely advisory, however helpful it might be. United States v. Brown, 470 F.2d 285, 289 (2d Cir. 1972). I would not reach that question since I would remand for an explicit finding under the Youth Corrections Act.

Judgments affirmed; OAKES, J., dissents from the affirmance as to appellant Hopkins and would reverse and remand for resentencing.