**James L. COBBS, Petitioner-Appellant,**

v.

**Carl ROBINSON, Warden, Connecticut State Prison, Respondent-Appellee.**

No. 322, Docket 75–2089.

United States Court of Appeals, Second Circuit.

Argued Nov. 7, 1975.

Decided Dec. 17, 1975.

Certiorari Denied March 1, 1976. See 96 S.Ct. 1419.

Bernard Green, Bridgeport, Conn., for appellant.

Donald A. Browne, State's Atty. for Fairfield County, Bridgeport, Conn., for appellee.

Before KAUFMAN, Chief Judge, and ANDERSON and MANSFIELD, Circuit Judges.

ROBERT P. ANDERSON, Circuit Judge:

The petitioner, James L. Cobbs, presently an inmate at the Connecticut State

Prison at Somers, was arrested on May 16, 1967, charged with the murder of one Batista Carbone who was found dead on August 27, 1966, in his apartment in the Green Apartments housing project in Bridgeport, Connecticut. The Fairfield County grand jury indicted Cobbs for murder in the first degree and he pleaded not guilty to the indictment.

At the trial, in the Superior Court of Connecticut before a judge and jury, there was evidence to show that Cobbs and another man had followed Carbone to his apartment and had rushed him when he opened the door; that the defendant and the other man knocked Carbone to the floor, stabbed him eleven times and strangled him. After robbing the victim, the defendant left the apartment house. He was then carrying a towel with what appeared to be blood on it, a kitchen knife which also had blood on it, a wristwatch, and a ten dollar bill. He walked to the car of a friend and said to him, "We just killed a man." The defendant then requested another friend to give him a ride home. On the way, the car was stopped at a street intersection where the defendant threw the towel and the kitchen knife into a storm sewer. Some time later he showed this friend a newspaper article about the death of Carbone and the defendant indicated that it was true. The defendant sold a wristwatch to a fellow worker at the laundry where he was employed. It was later identified by Carbone's daughter as her father's watch.

When the police arrested the accused they orally gave him the *Miranda* warnings, and, as soon as they arrived at the police station, he was given the same warnings in a printed form entitled "Notification of Rights." Cobbs read the form, acknowledged he understood it, and signed it. He volunteered some incidental statements in a conversation which he himself initiated, but he told the police that he wanted to see a law-

yer before he described what actually happened. The police expressly told him that they did not need a statement from him as they had ample evidence. They provided him with a telephone and left him free to call anyone. Cobbs did not contact an attorney, but asked his grandmother to come to the police station. After he talked alone with her in a conference room,[1] they came out and Cobbs repeated the conversation he had had with her and made a full statement to the police lieutenant.

The jury returned a verdict of guilty of murder in the first degree, and Cobbs was sentenced, on the jury's recommendation, to life imprisonment. His conviction was affirmed by the Supreme Court of Connecticut in a thorough and well reasoned opinion, *State v. Cobbs,* 164 Conn. 402, 324 A.2d 234 (1973), and a petition for certiorari was denied by the United States Supreme Court, *Cobbs v. Connecticut,* 414 U.S. 861, 94 S.Ct. 77, 38 L.Ed.2d 112 (1973).

After exhausting his state remedies Cobbs petitioned for a writ of habeas corpus in the United States District Court for the District of Connecticut on the grounds of a challenge to the array of the grand jury, objections to its procedures, and a challenge to the array of the petit jury. As an additional ground he asserted that the statements which he made to the police shortly after his arrest were improperly admitted against him at trial. The parties agreed to proceed on the basis of the extensive record developed in the Connecticut state courts and, therefore, no evidentiary hearing was held by the District Court. The petition was denied, and the same issues raised below are now before us on appeal.

*The Grand Jury*

Petitioner moved in the State court to quash the indictment on the assertion that errors of constitutional proportions

---

1. The conference room was monitored, and Cobbs' conversation with his grandmother was recorded by the police. The trial judge refused to permit the jury to hear the tapes or any testimony regarding the colloquy in the conference room.

were committed in the selection of the grand jury array; namely that it was not chosen in such a manner as to provide a representative cross-section of the community from which it was drawn. He also charged that the grand jury's procedures were so defective that they deprived him of his liberty in violation of the United States Constitution.

A hearing was held on February 16, 1968, in the Superior Court, on petitioner's motion to quash. The evidence presented at that hearing was later summarized by the Supreme Court of Connecticut as follows (164 Conn. at 406–07, 324 A.2d at 238):

"[A]fter the Superior Court ordered a grand jury to be summoned, the sheriff for Fairfield County personally summoned the grand jury. From 1959 to June 19, 1967, when the defendant was indicted by the grand jury, the sheriff and his predecessor had maintained a list of names in the sheriff's office. This list or panel of prospective grand jurors was revised through additions and eliminations when persons died, moved to different locations or no longer desired to serve. Names were added to the list by the sheriff on recommendation of his deputy or persons who had high standing in the community. All persons listed were electors of above average intelligence and were volunteers for grand jury duty. The list included persons different in religious persuasion, race, national origin and political affiliation. The sheriff attempted to balance the list with respect to race and religious persuasion. In the five years prior to trial, only persons named in the list had been selected for the approximately fifteen grand juries called. The sheriff has never exercised his power of summons in order to obtain a grand jury. In summoning the grand jury for this case, the sheriff selected from his list forty-four persons whom he thought were best suited for service. From this group of forty-four persons the sheriff obtained eighteen persons. The sheriff avoided selecting persons

from Bridgeport [in conformity with his general policy of omitting persons from the town where the alleged crime was committed], and most of the grand jurors who were selected in this case had had prior experience and had participated as members of grand juries on homicide cases."

In addition to the foregoing facts, the record discloses that the sheriff was personally acquainted with most of the persons on the master list; that many of the individuals had been personally selected by either the sheriff or his predecessor in office; that the list contained about 138 names; and that in selecting the grand jurors for this particular case, the sheriff passed by the names of persons whom he felt would not have time to serve. The only statutory prerequisite to the selection was that all of the grand jurors must be electors of the County (Conn.Gen.Stat. § 54–45). Despite the sheriff's attempts to avoid selecting Bridgeport residents, there were in fact six on the eighteen-member grand jury.

 Although the States are not constitutionally required to use grand juries, *Alexander v. Louisiana,* 405 U.S. 625, 633, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972); *Branzburg v. Hayes,* 408 U.S. 665, 688 n. 25, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), it is nevertheless true that if a state elects to do so, the system for its selection must measure up to the constitutional standard of the Due Process and Equal Protection Clauses of the Fourteenth Amendment, which is that the system result in the selection of a representative cross-section of the community. It fails to do so if it systematically excludes any identifiable group from grand jury service. *Carter v. Jury Commission,* 396 U.S. 320, 330, 90 S.Ct. 518, 24 L.Ed.2d 549 (1970); *United States ex rel. Chestnut v. Criminal Court,* 442 F.2d 611 (2 Cir.), *cert. denied,* 404 U.S. 856, 92 S.Ct. 111, 30 L.Ed.2d 98 (1971); *United States ex rel. Epton v. Nenna,* 318 F.Supp. 899, 902–05 (S.D.N.Y.1970), *aff'd,* 446 F.2d 363 (2 Cir.), *cert. denied,*

404 U.S. 948, 92 S.Ct. 282, 30 L.Ed.2d 265 (1971).

In *United States ex rel. Chestnut v. Criminal Court, supra,* this court said:

> "Sitting as a federal court reviewing a state system . . . we are not at liberty to impose . . . our own views on which method we believe to be the ideal for grand jury selection. Our power is limited to determining whether the particular selection method . . . under review by us violated petitioner's rights to due process and equal protection . . . ." 442 F.2d at 615.

■ The role of a federal court in reviewing a state grand jury selection system is, therefore, a very limited one because the state has broad discretion in prescribing qualifications for both its grand and petit jurors. *Taylor v. Louisiana,* 419 U.S. 522, 534, 538, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975); *Carter v. Jury Commission, supra,* 396 U.S. at 332, 90 S.Ct. 518; *Brown v. Allen,* 344 U.S. 443, 473–74, 73 S.Ct. 397, 97 L.Ed. 469 (1953); *Fay v. New York,* 332 U.S. 261, 67 S.Ct. 1613, 91 L.Ed. 2043 (1947). It is not the function of the federal courts to scrutinize the state's grand jury list to insure that it statistically reflects the proportionate size of every identifiable group as it relates to the whole community. Cf. *Swain v. Alabama,* 380 U.S. 202, 207–08, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965); *United States v. Jenkins,* 496 F.2d 57, 65 (2 Cir. 1974), *cert. denied,* 420 U.S. 925, 95 S.Ct. 1119, 43 L.Ed.2d 394 (1975). Instead, it is petitioner who, in challenging the array, has the burden, under the constitutional test stated above, of establishing that the class or classes which he claims have been excluded are, in fact, identifiable groups in the community, and that the selection system has operated to exclude them *Hernandez v. Texas,* 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954); *Quadra v. Superior Court,* 378 F.Supp. 605, 614 (N.D.Cal.1974).

■ Petitioner concedes that there was no intentional discrimination by the sheriff, and that he cannot demonstrate that any *identifiable groups,* for example, persons of a particular ethnic origin, race or religion, were excluded from the master list. Instead he simply asserts that the array was not chosen in a way which would produce a representative cross-section of the community [2] because literally hundreds of individuals for insufficient reasons were arbitrarily excluded from ever being considered at all. He points out that many of the members were selected on the basis of personal acquaintance with the sheriff, thereby eliminating from consideration substantial numbers of otherwise qualified persons; that the master list contained only 138 names, and excluded all who did not volunteer for grand jury duty; that the list had undergone only minor amendments in eight years,[3] making no allowance for any class or group changes; and that the sheriff attempted to exclude persons of below-average intelligence, persons residing in the town where the alleged crime was committed, and persons who probably would not have time to serve.

■ The district court in its excellent opinion discussed petitioner's claims that the grand jury was not chosen from a representative cross-section of the community because certain groups of indi-

---

**2.** One of the petitioner's principal complaints about the "asystematic" nature of the jury selection process was its non-random character. There is, however, no requirement that a state's grand jury selection process must operate through "random choice or the laws of chance," *Brooks v. Beto,* 366 F.2d 1, 4 (5 Cir. 1966), *cert. denied,* 386 U.S. 975, 87 S.Ct. 1169, 18 L.Ed.2d 135 *reh. denied,* 386 U.S. 1043, 87 S.Ct. 1489, 18 L.Ed.2d 618 (1967), so long as the process actually used produces jury lists which reasonably approximate a fair cross-section of the community. *Smith v. Yeager,* 465 F.2d 272, 282 (3 Cir. 1972), *cert. denied,* 409 U.S. 1076, 93 S.Ct. 685, 34 L.Ed.2d 665 (1972).

**3.** At oral argument, counsel for the State disclosed that the sheriff of Fairfield County has abandoned the grand jury selection methods used at the time of this case and is compiling a new grand jury list through a random selection process.

viduals were, in effect, deleted from the community for the purpose of performing jury duty. It said:

"The obstacle petitioner faces with respect to each of these groups is the same; none of them is a class whose absence from a grand jury list deprives that list of its cross-sectional status. The complete list of cognizable classes is of course not a settled matter. Compare *Taylor v. Louisiana,* 419 U.S. 522 [95 S.Ct. 692, 42 L.Ed.2d 690] . . . (1975), with *White v. Georgia,* 414 U.S. 886 [94 S.Ct. 222, 38 L.Ed.2d 134] (1973) (Brennan, J., dissenting from the denial of *certiorari* ). None of the groups whose exclusion petitioner protests, however, has in sufficient degree the characteristics shared by those classes whose exclusion is prohibited. Petitioner does not contend, nor could he, that a grand jury proceeding in the absence of these groups would be biased in favor of the prosecution, see *United States ex rel. Chestnut v. Criminal Court, supra,* 442 F.2d at 616. Petitioner does not attempt to show that any of these groups is singled out, or even likely to be singled out, as the victim of community discrimination, see *e. g., Hernandez v. Texas,* 347 U.S. 475 [74 S.Ct. 667, 98 L.Ed. 866] (1954). Nor has petitioner

'alleged facts pertaining to community attitudes, a factor which is, along with the attitudes, subjective identifications, and common interests of the putative group members, critical in determining whether the class is a distinct identifiable group. *Quadra v. Superior Court, supra,* 378 F.Supp. [605,] . . . 620–621 [N.D.Cal.1974.]'

See *Brooks v. Beto, supra,* 366 F.2d [1,] . . . 23 [(5 Cir. 1966)].

Conversely, systems depending heavily on volunteers and persons suggested by selected community members have frequently been approved. *E. g., Swain v. Alabama,* 380 U.S. 202, 207 n. 4 [85 S.Ct. 824, 13 L.Ed.2d 759] (1965); *United States ex rel. Chestnut v.*

*Criminal Court, supra; Brooks v. Beto, supra; United States ex rel. Epton v. Nenna,* 318 F.Supp. 899 (S.D.N.Y. 1970), *aff'd,* 446 F.2d 363 (2d Cir. 1971) [*cert. denied* 404 U.S. 948 (92 S.Ct. 282, 30 L.Ed.2d 265) (1971)]. It is only when systematic exclusion of a protected class is demonstrated that reliance on a system of personal acquaintances becomes constitutionally deficient, *Bailey v. Henslee,* 287 F.2d 936 (8th Cir. 1961).

■ Residents of the City of Bridgeport are also not necessarily a cognizable class. No showing is made that the city lines also serve to separate racial groups or economic classes to any significant extent. *Cf. United States v. Butera,* 420 F.2d 564, 571–72 (1st Cir. 1970). Similarly, the attempt to include persons of better than average intelligence on grand juries is not proscribed by the Constitution, see *Carter v. Jury Commission,* 396 U.S. 320, 332–33 [90 S.Ct. 518, 24 L.Ed.2d 549] (1970), and might even be supported by the state's compelling need, *Taylor v. Louisiana, supra,* [419 U.S. at 434–35 (95 S.Ct. 692)] . . . for speedy and accurate decision-making.

In terms of the policies underlying the suspect classifications, the groups identified by petitioner have nothing in common except their failure to have volunteered for grand jury duty, their not knowing the sheriff or his deputy or other persons of high standing in the community, their not being of above-average intelligence, and to some extent, their residence in the City of Bridgeport. These common characteristics, if they may be so described, do not rise to constitutional proportions. *Cf. Dumont v. Estelle,* 377 F.Supp. 374 (S.D.Tex.1974). The members of these groups lack a ' " 'fixed composition or thread which binds [them] into a cohesive group' " '; there is ' " 'no indication that the failure to canvass such persons defeats in any way the concept of an array from which impartial representative juries may be selected.' " ' *United States v.*

*Van Allen,* 208 F.Supp. 331, 334 (S.D. N.Y.1962) (citation omitted), *modified on other grounds sub nom. United States v. Kelly,* 349 F.2d 720 (2d Cir. 1965)." (Footnote omitted.)

We are in agreement with the district court's discussion and conclusion that the petitioner failed to show that the jury list for the selection of the grand jury was defective in that it did not reasonably approximate a fair cross-section of the community. Its holding is, moreover, consistent with the weight of authority.

In *United States ex rel. Chestnut v. Criminal Court, supra,* this court approved a New York grand jury selection process in which (a) only volunteers were used; (b) members were invited rather than summoned to serve; (c) they had to be between 35 and 65 years of age; (d) welfare recipients were excluded; and (e) certain ethnic and economic groups— blacks, Puerto Ricans, and (allegedly) "blue collar workers," while included, were statistically underrepresented in comparison to their position as a percentage of the overall community. In *United States ex rel. Epton v. Nenna, supra,* this court upheld a New York grand jury selection system which used only volunteers and, in practice, took only persons aged 35 to 65. In *United States v. Tropiano,* 418 F.2d 1069, 1079 (2 Cir. 1969), *cert. denied,* 397 U.S. 1021, 90 S.Ct. 1258, 25 L.Ed.2d 530 (1970), this court approved a federal grand jury selection process modeled after the Connecticut "key man" system, whereby several well known and highly reputable citizens of each of the eight counties recommended to the jury commissioners the names of electors of the respective counties who, they thought, would be qualified jurors. See also *Swain v. Alabama, supra* (approving a jury selection system that took mainly volunteers and persons recommended by certain community members); *Carter v. Jury Commission, supra,* 396 U.S. at 332, 90 S.Ct. 518 (state may select jurors on the basis of intelligence); *Quadra v. Superior Court, supra.* Compare *Carmical v. Craven,* 457 F.2d 582 (5

Cir. 1971), *cert. denied,* 409 U.S. 929, 93 S.Ct. 227, 34 L.Ed.2d 186 (1972); *Labat v. Bennett,* 365 F.2d 698 (5 Cir. 1966), *cert. denied,* 386 U.S. 991, 87 S.Ct. 1303, 18 L.Ed.2d 334 (1967) (cases in which a systematic exclusion of identifiable groups *was* shown).

Petitioner asserts that his claim is supported by *Avery v. Georgia,* 345 U.S. 559, 73 S.Ct. 891, 97 L.Ed. 1244 (1953), where a state conviction was reversed on the ground that the petit jury selection system used "[made] it easier for those to discriminate who are of a mind to discriminate." 345 U.S. at 562, 73 S.Ct. at 892. In *Avery,* however, the defendant made a *prima facie* showing that an identifiable group, blacks, had been excluded and thus shifted the burden of explanation to the state. See also *Quadra v. Superior Court, supra,* 378 F.Supp. at 613–14; *Johnson v. Durante,* 387 F.Supp. 149, 150–51 (E.D.N.Y.1975). Here, petitioner's proof is insufficient to make such a *prima facie* case.

He has cited several cases to support the proposition that a defendant may attack an unconstitutional grand or petit jury selection process, even if he does not demonstrate that he was actually prejudiced by the challenged system. See, *e. g., Peters v. Kiff,* 407 U.S. 493, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972) (plurality opinion); *Taylor v. Louisiana, supra.* This issue is irrelevant to the present case, however, as petitioner simply has not shown any constitutional defect in the Connecticut grand jury selection process.

*Purpose and Procedure of Grand Jury*

The petitioner also asserts that the Superior Court of the State deprived him of Due Process under the Fourteenth Amendment to the Federal Constitution when it refused him permission to have his counsel with him in the grand jury room while testimony was being taken. He also claims his constitutional rights were impaired by the refusal of the Superior Court to provide him with a stenographic transcript of the grand jury minutes. We are satisfied,

however, that the petitioner was not deprived of any constitutional rights in either of these instances. Petitioner's proposals run counter to the traditional nature and purpose of the Connecticut grand jury which is convened and used only in cases which are punishable by death or life imprisonment.

 Contrary to widespread popular impression, the function of the grand jury is not simply to bring indictments against suspects, on its own or on demand from the State's Attorney. Rather, its duty is to hear the State's evidence and decide first whether it is sufficient to warrant putting a person, complained of by the State, on trial on the issue of his guilt or innocence of a crime for which the punishment might be death or life imprisonment. The grand jury, therefore, is a body of eighteen disinterested citizens, of whom twelve must agree to return a true bill, interposed between the persons charged and the power of the State in what might be a mistaken, unjust, or over zealous prosecution, to prevent the anxiety and risk, the expense, the loss of reputation, and like injury which would result to an innocent person from an ill-founded charge. If, on the other hand, it is satisfied from the State's evidence that there is probable cause to believe that the offense has been committed and that the person complained of has committed it, then the duty of the grand jury is to "return a true bill" and thus indict him. It is not until this point has been reached that the suspect becomes formally and legally an accused.

This dual function, in the great tradition of the institution of the grand jury, receives strong emphasis in the State court's instructions to the jury. In addition, the independence and impartial character of the grand jury is supported and buttressed by the following unique features of the Connecticut grand jury procedure:

(1) Neither the State's Attorney nor any counsel for the prosecution is allowed to appear before the grand jury. The prosecutor remains outside the grand jury room and sends the State's witnesses in one at a time for examination by the grand jury.

(2) There is a practicing attorney among the membership of the grand jury who usually acts as the foreman. He leads off in the examination of the witnesses, exercises some control to minimize the use of evidence which would be inadmissible at the trial itself, see *State v. Kemp,* 126 Conn. 60, 71, 9 A.2d 63 (1939), and seeks to protect both the interests of the person charged and the State.

(3) A person who is charged by the State with having committed a crime punishable by death or life imprisonment and whose case is being presented to a grand jury is permitted at his own election to be present in the grand jury room while the witnesses are being interrogated. He himself may question any or all of the witnesses, though the grand jurors may not question or examine him. He may not call or present witnesses to appear before the grand jury.

The right to be present in the grand jury room during the interrogation of witnesses was first accorded a suspect in *Lung's Case,* 1 Conn. 428 (1815), and has been continued by the "liberality of [the Connecticut] practice" (*State v. Fasset,* 16 Conn. 457, 468 (1844)) up to the present time.

Petitioner in the present case concedes that Connecticut is not obligated by the federal constitution to permit suspects to be present in the grand jury room. He argues, however, that since Connecticut *has* accorded this right to suspects in capital cases, the State is constitutionally required to permit him to appear before the grand jury accompanied by his counsel. Citing the familiar right-to-counsel cases beginning with *Powell v. Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932), and extending through *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), to *Coleman v. Alabama,* 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970), petitioner claims that he is entitled to the assistance of the

guiding hand of counsel at every step in the proceedings against him, both before and after the formal indictment. He argues that this is particularly true with respect to the grand jury proceedings, which he characterizes as a "critical stage" of the prosecution.[4]

In *United States v. Ash,* 413 U.S. 300, 93 S.Ct. 2568, 37 L.Ed.2d 619 (1973), the Supreme Court, while acknowledging a layman's need for the assistance of counsel in order to help him confront "complex legal technicalities" (413 U.S. at 307, 93 S.Ct. 2568), emphasized that the main function of counsel is to protect an accused from being exploited by the prosecutor in adversarial settings. It said:

> "[T]he test utilized by the Court has called for examination of the event in order to determine whether the accused required aid in coping with legal problems or assistance in meeting his adversary." 413 U.S. at 313, 93 S.Ct. at 2575.

> "[C]ounsel is . . . to be provided to prevent the defendant himself from falling into traps devised by a lawyer on the other side and to see to it that all available defenses are proffered." 413 U.S. at 317, 93 S.Ct. at 2577 (quoting *United States v. Bennett,* 409 F.2d 888, 899 (2 Cir.), *cert. denied,* 396 U.S. 852, 90 S.Ct. 113, 24 L.Ed.2d 101 (1969)).

Since the prosecutor does not appear before the Connecticut grand jury, a suspect does not "meet" his adversary in the grand jury room, nor is he subject to examination by anyone, and, therefore, he is not placed in a position where he can be "trapped" by the prosecutor. Other than questioning the witnesses, the suspect cannot affirmatively participate in the proceedings, and may not proffer any defenses, or conceivably waive any defenses or rights. The grand juror who is a member of the bar and is usually designated as foreman, can and should see to it that the proceedings are conducted in accordance with law and in complete fairness, both to the person charged and to the State. The dangers and circumstances which *Ash* described as calling for the assistance of counsel are not present, and thus petitioner's claim of a right to counsel must fail.

Moreover, the petitioner has not shown that he was prejudiced by the denial of his motion to have his counsel in the grand jury room. In *Coleman v. Alabama, supra,* the Supreme Court simply remanded the case to the Alabama courts for a determination of whether the defendant had been prejudiced by the lack of counsel at the preliminary

---

**4.** Although the issue of the right to counsel is a question of federal constitutional law, it may be noted that the Supreme Court of Connecticut has held that the grand jury is not a "critical stage" of a criminal proceeding under Connecticut law, nor does a suspect become "the accused" until an indictment is returned against him. *State v. Stallings,* 154 Conn. 272, 282–83, 224 A.2d 718 (1966). Compare *Kirby v. Illinois,* 406 U.S. 682, 688–89, 92 S.Ct. 1877, 1881, 32 L.Ed.2d 411 (1972), where a plurality of the Supreme Court held the "right to counsel attaches only at or after the time that adversary judicial proceedings have been initiated . . ." ". . . whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." "For it is only then that the government has committed itself to prosecute, and only then that the adverse positions of government and defendant have solidified."

Petitioner's counsel relies heavily on *Coleman v. Alabama,* 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970), in which the Supreme Court held that a suspect was entitled to counsel at a preliminary hearing, the purpose of which was to determine whether there was sufficient evidence to warrant presentation of the case to a grand jury, even though, under Alabama practice, the prosecutor could at his option omit this preliminary hearing and proceed directly before the grand jury. The Court in *United States v. Ash,* 413 U.S. 300, 311, 93 S.Ct. 2568, 2574, 37 L.Ed.2d 619 (1973), characterized the preliminary hearing in *Coleman* as one where ". . . the accused was confronted by his adversary at a 'critical stage' preliminary hearing at which the uncounselled accused could not hope to obtain so much benefit as could his skilled adversary." The Connecticut grand jury proceedings are not at all comparable to the preliminary hearing in Alabama and are readily distinguishable from it.

hearing, which, as noted above, was clearly adversary in nature and distinguishable from the grand jury proceeding in the present case.

If, as urged by the petitioner, every suspect whose case is before the grand jury, is granted the right to be accompanied by his counsel while he is in the grand jury room, it would inevitably and speedily follow that the State's Attorney would also be granted the right to be there to present the State's case. The Connecticut grand jury would thereupon become an adversary proceeding, and it would entirely lose its character and purpose. We do not find that there is any constitutional mandate which requires or permits the petitioner to have his attorney with him when petitioner exercises his right to be present in the jury room during the questioning of witnesses by the Connecticut grand jury.[5] See, *In re Groban,* 352 U.S. 330, 333, 77 S.Ct. 510, 1 L.Ed.2d 376 (1957).

While the Connecticut grand jury, particularly in its procedures, has much to be said in its favor, the holding in the present case should not be broadly construed as a certification of approval which can be relied upon in the future against federal constitutional attack. Although in this instance there was nothing in the case to show that, in the selection of the grand jury there was any systematic exclusion of an identifiable group or that the jury list was otherwise not a representative cross-section of the community, the method of selection resting as it does entirely in the hands of one person, the sheriff of the county, leaves much to be desired. If it should so happen that a future grand jury list should disclose that an identifiable group had, at best, no more than a token representation and there was also evidence of statements by the county sheriff, which were disparaging to that group, or other evidence of hostility, even though implied, the State would be faced with a more serious federal constitutional question.

Moreover, putting aside constitutional considerations, public confidence is so important and powerful a body as the grand jury, is not enhanced by leaving the whole matter of selection to a single individual, whose choices are made entirely on his own predelictions, free from

---

5. The grand jury as an institution has been under attack for the past three or four decades. Most of the adverse criticism centers around the complaint that the grand jury is too much under the influence of and subservient to the orders of the prosecutor and may therefore be an instrument of oppression rather than a bulwark against the persecution of the innocent. It is claimed, rightly or wrongly, that the grand jury readily reports out true bills against the persons brought before it but pays no more than lip service to the grand jury's other very important traditional function which is to stand between the prosecutorial powers of the state and an innocent target. Judge Marvin E. Frankel of the U. S. District Court for the Southern District of New York, in association with Attorney Gary P. Naftalis of the New York Bar, has written an excellent article covering the history, functions and operations of the grand jury as an institution, and the criticisms and problems which have attended it. While it is particularly concerned with grand juries in the federal system, it is a very helpful and instructive review for anyone concerned with the institution. It was published in the November 10, 1975 issue of the New Leader, Vol. LVIII, No. 22.

While the writers of the article had no occasion to take up the grand jury system in each of the states, it inevitably comes to mind to anyone aware of the problems and adverse criticisms of grand jury functions as it is used in the federal system and in those of some of the states, that the adoption of the unique features of the Connecticut procedures, particularly the exclusion of the prosecutor from the grand jury room and the right of the suspect or target to be present throughout the interrogation of witnesses by the grand jury are attributes which warrant serious consideration in any effort to improve the procedures of the grand jury and enable it, more adequately and more perfectly, to fulfill its historic missions.

It is also helpful to have a practicing member of the County Bar as a member and foreman of the grand jury. While this has developed in Connecticut as a matter of custom and usage, it might be worthwhile to consider the desirability of making this a rule of court and at the same time making provision for any particular qualifications for such an attorney-foreman and a statement of his powers and duties as such.

any legal standards or qualifications other than the statutory requirement that the grand juror be an elector of the county. There is lacking even the appearance of a selection process which provides safeguards against ulterior influences, and other protections to assure an impartial and fair minded grand jury. It is, of course, beyond the power of this court to say what the selection procedure should be. This, and the standards which must be followed, are within the authority of the State alone to determine; and what Connecticut decides governs, short of a federal constitutional defect.

Petitioner also claims that he was constitutionally entitled to have a stenographic recording of the grand jury minutes. The Supreme Court of Connecticut has, however, explicitly held that there is no such right. *State v. Vennard,* 159 Conn. 385, 390, 270 A.2d 837 (1970). Likewise, this court in *United States v. Cramer,* 447 F.2d 210, 213 (2 Cir. 1971), *cert. denied,* 404 U.S. 1024, 92 S.Ct. 680, 30 L.Ed.2d 674 (1972), stated:

> "[A] defendant is not entitled to a reversal of his conviction simply because testimony before the grand jury which returned an indictment against him has not been recorded. This is the position taken by every court which has considered the problem . . . ."

## Petit Jury Array

After the petit jury for his case had been impanelled, petitioner made a challenge to the array on the ground that certain Connecticut statutes governing jury selection had been violated by the jury committees of several towns in Fairfield County. A hearing was held on the issue in the Superior Court at which members of the jury committees from six of the towns testified to the procedures each followed in compiling the jury lists of the respective towns. The Supreme Court of Connecticut summarized the trial court's findings as follows:

> "Some of the six jury committees exempted persons who were not entitled to be exempt by statute, and some did not select prospective jurors strictly by lot. In some instances women having a right of elective exemption were exempted from jury service without an inquiry as to whether they elected to serve. Some of the committees exercised judgment in making a selection of persons to serve and in some instances exercised discretion in eliminating hardship cases which in their experience they knew the court would excuse. The finding also reveals that the [County] jury commission receives annually between 11,000 and 12,000 names of prospective jurors from the various jury committees in the county and that challenges went to seventy-six jurors of a panel of 137. There was no finding or conclusion of prejudice to the defendant. The finding is silent as to the action of the jury committees in the remaining seventeen towns in selecting juries."

 The petitioner has the burden of demonstrating that an identifiable group or groups were excluded from the array, so that it was not a representative cross-section of the community. Again, however, he has failed to show that the statutory violations caused any identifiable group to be excluded from the overall County jury list from which the panel in his case was drawn. His claim is that several of the town committees omitted employed males and chose instead unemployed wives without young children. Nevertheless, the array from these towns from which petitioner's jury was selected, consisted of 55% females to 45% males, which was approximately the same proportion as in the general population. The only conclusion that can be drawn from the evidence offered is that these statutory violations had only a *de minimis* effect on the composition of the County list that was drawn from more than 12,000 names.

Both federal and state courts have held that the fact that a jury committee did not follow statutory guidelines in selecting the jury array is not a federal constitutional error, absent a showing

that the violations operated to exclude an identifiable group from the jury list. See, *e. g., Bradley v. Texas,* 470 F.2d 785 (5 Cir. 1972); *Bokulich v. Jury Commission,* 298 F.Supp. 181, 192 (N.D.Ala.1968), *aff'd on other grounds,* 394 U.S. 97, 89 S.Ct. 767, 22 L.Ed.2d 109 (1969); *State v. Ferraro,* 146 ·Conn. 59, 147 A.2d 478 (1958). See also *United States v. Silverman,* 449 F.2d 1341 (2 Cir. 1971), *cert. denied,* 405 U.S. 918, 92 S.Ct. 943, 30 L.Ed.2d 788 (1972).

*Admissibility of Statements*

Petitioner claims that the admission at his trial of certain inculpatory statements which he made to the police at the time of his arrest was error because they were elicited from him in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

 The record developed in the Connecticut state courts, on which the parties agreed to proceed in the court below, shows that the petitioner, at the time of his arrest, was advised of his rights as prescribed in *Miranda,* and was so advised again at the police station where he was given the written "Notification of Rights" which he read. He acknowledged that he understood the notification and signed it. A police officer advised him that no statement from him was needed because they already had sufficient evidence concerning the murder. Following a conversation with one of the officers who revealed to Cobbs some of the facts known to them, Cobbs stated that he wished to call his lawyer before he told them what had actually occurred. Although he was given free access to the telephone, he didn't call a lawyer, but telephoned to his grandmother and asked her to come to the station, where he spoke alone with her in a separate room. They talked there for five or ten minutes and then rejoined the police officers. In the officers' presence the grandmother advised Cobbs to tell them the truth, and asked him why he had gone to Carbone's apartment. He replied that they had gone there to mug a man, and he was killed. Petition-

er then stated he would describe what had happened and gave the police a detailed description of the events concerning the homicide.

When Cobbs first arrived at the police station and after he had been fully warned of his rights, he engaged in some conversation with the officers, and answered occasional questions, but there was no evidence of any attempt at an interrogation by the police on the subject of the homicide, and, after Cobbs asked to call his lawyer, no questions at all were asked of him. At no time did he express a desire to remain silent. Moreover, there was no evidence of the use of any physical or mental coercion upon him. *United States ex rel. Lewis v. Henderson,* 520 F.2d 896, 901 (2 Cir. 1975). The district court correctly concluded, as had the courts of Connecticut, that the accused was fully warned of his constitutional rights in timely fashion and that he was aware of them and understood them; that in recounting to the police the facts of, and the circumstances attending, the murder, including the confession of his own part in the crime, Cobbs acted freely and voluntarily; and he knowingly and intelligently waived his right to remain silent.

Likewise, after telling the police of his wish to consult counsel and the officers had afforded him ample opportunity to obtain one, he made clear, through his words and actions and failure to make further mention of the matter of counsel, that he had abandoned any intention of getting or consulting an attorney. The courts, therefore, were fully justified in concluding that Cobbs had knowingly and intelligently waived his right to counsel.

The district court's disposition of these issues raised by the petitioner is consistent with the decisions of this Circuit. *United States v. Gaynor,* 472 F.2d 899 (2 Cir. 1973); *United States v. Kaylor,* 491 F.2d 1127 (2 Cir. 1973), *sentence vacated and case remanded for resentencing,* 491 F.2d 1133 (2 Cir. en banc), *judgment vacated on other grounds sub nom. United States v. Hopkins,* 418 U.S. 909, 94 S.Ct.

3201, 41 L.Ed.2d 1155 (1974); *United States v. Collins,* 462 F.2d 792 (2 Cir.), *cert. denied,* 409 U.S. 988, 93 S.Ct. 343, 34 L.Ed.2d 254 (1972).

The district court's denial of the petition for a writ of habeas corpus is affirmed.