**Herbert SIMS, Petitioner–Appellant,**

**v.**

**James E. SULLIVAN, Superintendent, Sing Sing Correctional Facility; Robert Abrams, Attorney General of the State of New York; John J. Santucci, District Attorney, County of Queens, Respondents–Appellees.**

**No. 405, Docket 88–2129.**

United States Court of Appeals, Second Circuit.

Argued Dec. 2, 1988.

Decided Feb. 6, 1989.

Robert E. Precht, The Legal Aid Soc., Federal Defender Services Unit, New York City, for petitioner-appellant.

Mark Osnowitz, Asst. Dist. Atty., Queens County, Kew Gardens, N.Y. (John J. Santucci, Dist. Atty. for Queens County, Kew Gardens, N.Y., of counsel), for respondents-appellees.

Before WINTER and MAHONEY, Circuit Judges, and METZNER, District Judge.*

WINTER, Circuit Judge:

This appeal presents the question whether an in-court identification was so suggestive as to violate a defendant's due process right to fundamental fairness. We conclude that, although in some cases such an identification might be so unreliable and so crucial to the prosecution's case as to violate fundamental fairness, the petitioner's due process rights were not violated by the

* The Hon. Charles M. Metzner, United States District Judge for the Southern District of New

identification procedures used in the present case.

## BACKGROUND

At trial, the state introduced evidence to show the following. In the early morning hours of December 4, 1975, an elderly woman was found murdered in her apartment in Far Rockaway, New York after police and firemen had been called to the scene to fight a fire of suspicious origin in the apartment. The victim, who died from strangulation, had been brutally beaten and had suffered multiple lacerations of the vagina and intestinal area, inflicted with a stick-like instrument. Detectives at the scene discovered a table leg, approximately fourteen inches in length, later found to bear traces of human feces and blood.

Petitioner Sims's co-defendant Mark Washington was one of numerous neighborhood youths interviewed during the early months of the investigation. Approximately three and one-half years later, in the spring of 1979, petitioner and Washington were arrested after information was provided by one Charles Ellis and indicted for intentional and felony murder and related charges. Ellis, a friend of Sims and Washington, later testified that on the evening of December 3, 1975, the night before the body was found, he was at a mutual acquaintance's house with Sims and Washington. Washington asked Sims and Ellis if they were "going to do a burglary," whereupon the three went to the fifth floor of the victim's apartment building and knocked on a door. Ellis testified that an elderly woman, fitting the description of the victim, answered, and that Washington then kicked his way in. Ellis's story regarding subsequent events was inconsistent. In his grand jury testimony, reread and reaffirmed by Ellis only two hours before testifying at trial, Ellis stated that Sims had entered the apartment. On direct examination, however, he testified that Sims had not entered the apartment during

York, sitting by designation.

the incident. On cross-examination, Ellis then disavowed any knowledge of the incident.

The prosecution also presented testimony from one George Ortiz, a friend of Washington. Ortiz testified that in December 1975 Washington gave Ortiz $40 and boasted that he had obtained the money when he and others had "yoked" (held a person by the neck and took his or her property) an "old white lady" in the building where the victim lived. In addition, a Steven Morris testified that he had had a conversation with Sims in the summer of 1977 concerning Sims's involvement in a burglary and homicide in Far Rockaway. In that conversation, Sims admitted committing the homicide in Far Rockaway but later added that he was "just joking."

Fred Hawkins, a resident of the victim's apartment building who was present the night of the murder, also testified. Prior to trial, a hearing was held to determine whether Hawkins would be permitted to identify Sims and co-defendant Washington in court as two of three young black men he saw in the lobby and stairwell of the apartment building that night. Defense counsel requested a hearing, pursuant to *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), to determine whether Hawkins's prior identification of Sims from two photo arrays, four years after the crime, was so suggestive as to render a later in-court identification unreliable. After the hearing, defense counsel did not challenge the propriety of the photographic identification procedure, and the court decided to allow Hawkins to identify petitioner in court. Defense counsel's motion for a pre-trial lineup was denied.

Hawkins testified that on the night of the murder he returned home from work at around 7:00 p.m. and noticed three young black males in the lobby. Hawkins waited for two of the men to step out of his way and then went upstairs. This encounter lasted approximately one minute. Shortly thereafter, Hawkins went out for the evening. When he returned at around 11:00 p.m., one of the three youths he had seen earlier was standing in the lobby. Hawkins heard him yell "cool it" or "be cool" up the stairs. At the *Simmons* hearing, Hawkins estimated that he saw the youth in the lobby and the one farther down on the stairs for a minute or two each. At about 12:30 a.m., Hawkins heard screams and the sound of glass breaking coming from the vicinity of the victim's apartment. Around three hours later, Hawkins received word there was a fire on the victim's floor of the building and had his mother contact the fire department.

After the murder, Hawkins gave the police descriptions consistent with the appearance of Ellis, Sims and Washington. The next day he viewed various photographs at the stationhouse but was unable to make any identification. Several months later, in 1976, Hawkins saw one of the three men, later identified as Washington, on a street in Far Rockaway. In late 1979, a detective asked Hawkins to view two photo arrays. From each array, Hawkins chose a photo of Sims and one of Washington. He was quite certain of the Washington identification but less certain of the identification of Sims, about whom he said "I believe [petitioner] to be one of the people ... I can't be a hundred percent positive."

Hawkins testified at trial as to his observations described above and identified Sims in court as one of the youths in question. Sims was thereafter acquitted of common-law murder but convicted of felony murder and first degree burglary. On appeal, the Appellate Division rejected Sims's claim that he was denied due process of law by the denial of his request for a lineup and by the subsequent in-court identification.

After being denied leave to appeal to the New York Court of Appeals, Sims filed a petition for a writ of habeas corpus in the Eastern District of New York, raising the due process claim. Judge Nickerson denied the petition, stating in relevant part:

> [Hawkins] later identified plaintiff from a photographic identification procedure which defendants did not find fault with. Indeed, the trial judge conducted a lengthy hearing to examine the possible suggestiveness of the photographic pro-

cedure, and concluded that the identification was proper....

This court has examined the record of the hearing and of the trial and is satisfied that Hawkins' identification was sufficiently reliable so that no due process violation took place. There was therefore no need for the trial judge to direct a lineup.

## DISCUSSION

█ On appeal, Sims contends that the in-court identification, conducted several years after the crime and without an intervening lineup, was the equivalent of a "show-up" and so unreliable as to deny him due process. We disagree. Although relevant precedent does not exclude the possibility that an in-court identification could be so unreliable as to violate fundamental fairness, in a case such as the instant one, where the pretrial identification procedures were proper and the other evidence of the defendant's guilt was ample, no deprivation of due process exists.

█ A defendant has no constitutional right to a lineup, and the decision whether to grant one is a matter for the exercise of discretion by the trial court. *United States v. Brown*, 699 F.2d 585, 593 (2d Cir.1983); *United States v. Campbell*, 581 F.2d 22, 28 (2d Cir.1978); *United States v. Estremera*, 531 F.2d 1103, 1110 (2d Cir.), *cert. denied*, 425 U.S. 979, 96 S.Ct. 2184, 48 L.Ed.2d 804 (1976); *United States v. Boston*, 508 F.2d 1171, 1176–77 (2d Cir.1974), *cert. denied*, 421 U.S. 1001, 95 S.Ct. 2401, 44 L.Ed.2d 669 (1975); *United States v. Ravich*, 421 F.2d 1196, 1203 (2d Cir.), *cert. denied*, 400 U.S. 834, 91 S.Ct. 69, 27 L.Ed. 2d 66 (1970). Nevertheless, the failure to grant a lineup may constitute a denial of fundamental fairness where the in-court identification is so unreliable that " 'a very substantial likelihood of irreparable misidentification' " exists. *Manson v. Brathwaite*, 432 U.S. 98, 116, 97 S.Ct. 2243, 2254, 53 L.Ed.2d 140 (1977) (quoting *Simmons*, 390 U.S. at 384, 88 S.Ct. at 971); *see United States v. Campbell*, 581 F.2d at 28. However, "[s]hort of that point, such evidence is for the jury to weigh." *Manson*,

432 U.S. at 116, 97 S.Ct. at 2254. In determining whether that point has been reached, courts must bear in mind their "obligation to ensure that the in-court procedure ... did not simply 'amount[ ] to a "show-up." ' " *United States v. Archibald*, 734 F.2d 938, 941, *modified*, 756 F.2d 223 (2d Cir.1984) (quoting *United States v. Kaylor*, 491 F.2d 1127, 1131 (2d Cir.1973), *vacated on other grounds sub nom. United States v. Hopkins*, 418 U.S. 909, 94 S.Ct. 3201, 41 L.Ed.2d 1155 (1974)). Even in the case of a show-up, though, whether such testimony is admissible will depend on the totality of the circumstances. *Kaylor*, 491 F.2d at 1131.

In determining whether an in-court identification which follows a pretrial identification violates fundamental fairness, we must first determine "whether the pretrial identification procedures were unduly suggestive of the suspect's guilt." If they were, we then must balance the suggestiveness of the identification procedures against "factors indicating that the in-court identification was independently reliable," *Dickerson v. Fogg*, 692 F.2d 238, 244 (2d Cir.1982), including the considerations listed in *Neil v. Biggers*, 409 U.S. 188, 199–200, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972), and *Manson*, 432 U.S. at 114, 97 S.Ct. at 2253. Because the pretrial procedures in the instant case were not unduly suggestive, and thus did not taint the in-court identification, we need not address the question of the independent reliability of Hawkins's identification of Sims.

In this case, Sims does not challenge the fairness of the pretrial photographic identification procedure, which consisted of Hawkins selecting photographs of petitioner from two separate photo arrays. Instead, Sims emphasizes that Hawkins stated that his photographic identification was less than "one hundred percent positive," an uncertainty repeated before the jury concerning his in-court identification. That degree of uncertainty, however, is insufficient to warrant disregarding the identification as a matter of law. Rather, it is a question for the jury. *See Manson v. Brathwaite*, 432 U.S. at 116, 97 S.Ct. at

2254 ("[j]uries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature"). The in-court identification was thus not tainted by improper pretrial procedures.

In addition, we are not bound in a collateral attack upon a state court conviction to view an in-court identification in isolation from the rest of the evidence, as Sims appears to contend. *Cf. Archibald*, 734 F.2d at 941 (evidence that defendant was perpetrator renders improper in-court identification in federal criminal case harmless). Because there is no constitutional right to a lineup, the validity of an in-court identification, and, conversely, the need for a lineup, will thus vary according to the strength and nature of the other evidence against a defendant. In the present case, an accomplice directly implicated Sims in the crime and another witness testified as to Sims's admission of his involvement. Hawkins's in-court identification was thus less crucial than Sims would have us believe.

Moreover, Sims demanded a full-dress lineup and made no effort at trial to have the identification staged in a less suggestive manner, as did the defendant in *Archibald*. For example, petitioner could have requested to sit elsewhere than at counsel table, and the trial judge might well have been receptive to precautionary measures that were not time-consuming. In addition, this case is unlike *Dickerson*, 692 F.2d 238, which involved a habeas petitioner's claim that suggestive pretrial identification procedures tainted an in-court identification. In *Dickerson*, the witness could at first describe defendant only as one of "four young male blacks" who had robbed him. 692 F.2d at 241–42. The court found the pretrial identification to have been impermissibly suggestive, thereby constituting an "unjustifiable show-up," 692 F.2d at 244, where the following three factors were combined: (i) investigators directly focused the attention of the witness on two specific male blacks; (ii) investigators forced the witness to take a second and third look at defendant after the witness's first identification had been tentative; and (iii) the police arrested the defendant in the presence of the witness, while the defendant had been watching his cousin's arraignment on stolen car charges related to the armed robbery. *Id.* at 244–45. After having found these pretrial procedures improper, the *Dickerson* court went on to apply the balancing test. By contrast, in the instant case, the pretrial photographic identification procedure was entirely proper, and the witness was able to describe to police the approximate height, weight, age, skin tone and clothing of petitioner and his companions.

AFFIRMED.